```
 1                  THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF CALIFORNIA
 2

 3                    HONORABLE JANIS L. SAMMARTINO
                  UNITED STATES DISTRICT JUDGE PRESIDING
 4

 5         ------------------------------------------------------

 6         FOUNDER STARCOIN, INC., A     )  JUNE 14, 2018
           CALIFORNIA CORPORATION,       )
 7                                       )
                          PLAINTIFF,     )
 8                                       )
           VS.                           )  NO. 18-CV-0972-JLS
 9                                       )
           LAUNCH LABS, INC., D/B/A      )
10         AXIOM ZEN, A CANADA CORP.,    )
                                         )  MOTION HEARING
11                        DEFENDANT.     )

12         ------------------------------------------------------

13

14         FOR THE PLAINTIFF:      STEPHEN M. LOBBIN
                                   AUSTIN J. RICHARDSON
15                                 JOSHUA OSBORN
                                   FOUNDATION LAW GROUP LLP
16                                 445 SOUTH FIGUEROA STREET, SUITE 3100
                                   LOS ANGELES, CA  90071
17

18

19         FOR THE DEFENDANT:      ADAM S. GERSHENSON
                                   ALEX MILLER
20                                 COOLEY LLP
                                   4401 EASTGATE MALL
21                                 SAN DIEGO, CA  92121

22

23

24

25         THE COURT REPORTER:     GAYLE WAKEFIELD, RPR, CRR
```

1

```
1     JUNE 14, 2018

2                         AFTERNOON SESSION

3          THE CLERK:  NUMBER ONE ON THE CALENDAR, 18-CV-972,

4     FOUNDER STARCOIN, INC. VS. LAUNCH LABS, INC.

5          THE COURT:  APPEARANCES, PLEASE.

6          MR. LOBBIN:  STEPHEN LOBBIN, FOUNDATION LAW GROUP HERE

7     IN SAN DIEGO, ON BEHALF OF PLAINTIFF.  WITH ME HERE TODAY IS MY

8     CLIENT, MR. JEVON FEINBLATT, AS WELL AS MY ASSOCIATE MR. JOSH

9     OSBORN, AND MY ASSOCIATE MR. AUSTIN RICHARDSON.  MR. RICHARDSON

10    WILL BE HANDLING THE PRESENTATION TO THE COURT TODAY.

11         THE COURT:  THANK YOU.

12         MR. GERSHENSON:  GOOD AFTERNOON, YOUR HONOR, ADAM

13    GERSHENSON FROM COOLEY LLP ON BEHALF OF AXIOM ZEN.  WITH ME

14    HERE TODAY IS MY COLLEAGUE ALEX MILLER, AS WELL AS THE GENERAL

15    COUNSEL STEVE KRAUSE.

16         THE COURT:  THANK YOU.

17         A COUPLE OF THINGS; FIRST OF ALL, A LOT OF DOCUMENTS

18    AND PLEADINGS WERE FILED UNDER SEAL.  DOES THIS COURTROOM NEED

19    TO BE CLOSED FOR PURPOSES OF THIS HEARING THIS AFTERNOON,

20    FOLKS?

21         MR. LOBBIN:  ALL THINGS BEING EQUAL, YOUR HONOR,

22    PLAINTIFF'S POSITION IS THAT IT WOULD BE NICE TO DO THAT.  WE

23    WOULD FEEL MORE FREE TO SPEAK REGARDING THE MATTERS THAT HAVE

24    BEEN BRIEFED.

25         MR. GERSHENSON:  NO, YOUR HONOR, WE'RE FULLY
```

1      COMFORTABLE WITH AN OPEN COURTROOM.

2             THE COURT:  SO THE OTHER THING THAT I HAVE TO THINK

3      THROUGH ON THIS IS WHETHER OR NOT -- IN FACT, THERE'S NOBODY

4      HERE.  SO IT MAY BE A MOOT QUESTION AND WE DON'T HAVE TO WORRY

5      ABOUT IT, BUT ALSO WHEN I PUT OUT AN ORDER IN THIS CASE,

6      WHETHER IT NEEDS TO BE A REDACTED ORDER, A SEALED ORDER, HOW WE

7      HANDLE IT.  LET'S CONTINUE.  FOR NOW, I'M GOING TO SAY WE DON'T

8      HAVE TO CROSS THAT BRIDGE EXCEPT -- NOBODY IS HERE EXCEPT

9      PEOPLE FROM THE COURT AND PEOPLE YOU'VE AUTHORIZED TO BE HERE

10     WITH YOU.

11            MR. LOBBIN:  WE'RE COMFORTABLE WITH THAT INFORMAL

12     AGREEMENT AMONGST ALL OF US IN THE ROOM.

13            THE COURT:  VERY WELL.  SO I HAVE A TENTATIVE RULING

14     FOR YOU THIS AFTERNOON, AND WE HAVE AN HOUR FOR THIS MATTER,

15     BUT BEFORE WE GET TO THAT, AS PART OF THE MOTION BOTH PARTIES

16     FILED A COPY OF PLAINTIFF'S SLIDE DECK, WHICH WAS SENT FROM MR.

17     FEINBLATT TO MS. REBAK, AND PLAINTIFF'S SLIDE DECK CONTAINS A

18     SLIDE DEPICTING THE REGULATORY TEAM.  ON THE REGULATORY TEAM

19     ARE TWO GENTLEMEN WHO APPARENTLY WORKED FOR COOLEY.  MR.

20     PATRICK MURCK AND MR. MARCO SANTORI.  OF COURSE, COOLEY IS

21     REPRESENTING THE DEFENDANT IN THIS CASE, SO MY QUESTION FOR

22     DEFENSE COUNSEL IS, IS THERE A CONFLICT HERE, SIR?

23            MR. GERSHENSON:  AN EXCELLENT QUESTION, YOUR HONOR.  WE

24     HAVE DUG INTO IT AND THE TRUTH IS --

25            THE COURT:  PULL THE MIC A LITTLE BIT CLOSER.

1          MR. GERSHENSON:  OF COURSE.  THE ANSWER IS IT'S AN

2     EXCELLENT QUESTION.  WE HAVE THOROUGHLY LOOKED INTO IT.  THERE

3     IS ABSOLUTELY NO ENGAGEMENT LETTER WHATSOEVER BETWEEN COOLEY

4     AND THE PLAINTIFF HERE.  THERE WAS NO ENGAGEMENT ENTERED.  WE

5     WERE TAKEN ABACK.  WE NOTICED THE ISSUE ON THE SLIDE --

6          THE COURT:  NOBODY SAID ANYTHING.  I WAS BLOWN AWAY

7     THAT NOBODY WOULD ADDRESS THAT IN THE PAPERS WITH EVERYTHING

8     THAT WAS FILED, SO TELL ME WHY IT DOESN'T MATTER.

9          MR. GERSHENSON:  WELL, IT DOESN'T MATTER, YOUR HONOR,

10     BECAUSE THERE IS NO CONFLICT.  WE'VE DONE THE ETHICAL RESEARCH.

11     WE FEEL WE ARE NOT CONFLICTED.  WE'VE DONE THE ETHICAL

12     RESEARCH.  WE FEEL WE'RE NOT CONFLICTED IN ANY WAY.  I DON'T

13     WANT TO CAST ASPERSIONS ON THE SLIDE DECK, BUT THERE WAS NO

14     ENGAGEMENT WITH MR. MURCK NOR MR. SANTORI.  MARCO NO LONGER

15     WORKS FOR COOLEY TO BE CLEAR.

16          THE COURT:  NO, I UNDERSTAND THAT, BUT MR. MURCK,

17     PATRICK MURCK, DOES.  LET ME ASK YOU THIS, SO YOU'RE SAYING

18     THEY NEVER WORKED TOGETHER.

19          MR. GERSHENSON:  THE ANSWER IS THAT FROM EVERYTHING

20     THAT I HAVE LEARNED, AND OBVIOUSLY I WENT THROUGH OUR ETHICAL

21     COUNSEL AND KEPT A FIREWALL AND THE LIKE, IS THAT THE FOUNDER

22     OF STARCOIN, TO THE EXTENT THAT'S AN ACTUAL ENTITY, OR JEVON

23     REACHED OUT, TRIED TO WORK WITH THEM, AND WAS REBUFFED.

24          THE COURT:  OKAY, FAIR ENOUGH.  THANK YOU.

25          MR. GERSHENSON:  OF COURSE, YOUR HONOR.

4

1          MR. LOBBIN:  YOUR HONOR, I CAN ADDRESS THIS BRIEFLY,

2     AND FRANKLY I'M GRATEFUL TO THE COURT FOR BRINGING THIS UP.

3          THE COURT:  WELL, I THINK IT'S APPALLING TO THE COURT

4     THAT NEITHER SIDE WOULD HAVE ADDRESSED IT.  VERY QUICKLY,

5     BECAUSE WE'RE ON THE CLOCK THIS AFTERNOON.  WE'VE GOT ONE HOUR.

6          MR. LOBBIN:  WE SCRATCHED OUR HEAD, IS THIS AN ISSUE?

7     WE DON'T KNOW ENOUGH FACTS.  WE CERTAINLY KNOW WHAT OUR CLIENT

8     DID WHICH WAS REACHED OUT TO COOLEY, SHARE INFORMATION, AND

9     CONSIDER ENGAGEMENT OF COOLEY AS THEIR COUNSEL; IT DID NOT

10    MATERIALIZE.  SO WE ONLY KNEW THE FACTS FROM OUR SIDE.  WE DID

11    NOT WANT TO, TO USE COUNSEL'S WORD, CAST ASPERSIONS AT COOLEY

12    BECAUSE WE WOULD RATHER FOCUS ON THE MERITS OF THE RELIEF THAT

13    WE'RE REQUESTING RATHER THAN RAISE A CONFLICT ISSUE.

14         THE COURT:  YOU THINK YOU GAVE THEM CONFIDENTIAL

15    INFORMATION?

16         MR. LOBBIN:  I DON'T KNOW.

17         THE COURT:  DON'T YOU THINK THAT WOULD HAVE HELPED TO

18    KNOW AT THIS POINT?

19         MR. LOBBIN:  THERE ARE SOME OTHER ISSUES RELATING TO --

20    WE COOPERATE WITH COOLEY ALL THE TIME, MY FIRM DOES.  WE DO

21    OTHER WORK FOR THEM.  WE SORT OF WENT BACK CHANNEL AND REALIZED

22    THAT WE DIDN'T THINK IT WAS AN ISSUE THAT NEEDED TO BE RAISED

23    IN THIS CONTEXT.

24         THE COURT:  NOT WITH REGARD TO THIS CLIENT BUT WITH

25    REGARD TO OTHER CLIENTS YOU'RE SPEAKING YOU WORK WITH COOLEY

```
1       ALL THE TIME?  IS THAT WHAT YOU'RE TALKING ABOUT, SIR?

2            MR. LOBBIN:  THAT'S WHAT MY PARTNERS ARE TELLING ME.  I

3       DIDN'T WANT TO SAY IT WAS A CONFLICT NECESSARILY BECAUSE WE

4       DIDN'T KNOW ENOUGH TO RAISE THAT ISSUE.

5            THE COURT:  WHAT DO YOU SAY TO THAT, COUNSEL?

6            MR. GERSHENSON:  THAT ISSUE IS NEITHER HERE NOR THERE,

7       YOUR HONOR.  WE HAVE DONE AN ETHICAL REVIEW.  WE WERE NEVER

8       ENGAGED.  WE ARE NOT ENGAGED CURRENTLY.  WE ARE NOT ON BOTH

9       SIDES OF THIS MATTER.  WE'RE NOT PROVIDING ADVICE TO THEM.  I

10      AM NOT IN POSSESSION OF ANY CONFIDENTIAL INFORMATION OF ANY

11      KIND, YOUR HONOR, AND THAT WAS THE DECISION THAT WE REACHED

12      TOTALLY ON THE MERITS OF THIS MATTER.

13           THE COURT:  SO TO THE EXTENT TO WHICH THE OTHER SIDE

14      PRESENTED ANY INFORMATION TO COOLEY, IT'S ALL BEEN WALLED OFF?

15           MR. GERSHENSON:  A HUNDRED PERCENT, YOUR HONOR.

16           THE COURT:  THEY DON'T KNOW WHETHER THEY GAVE YOU

17      ANYTHING OR NOT.  IT'S VERY STRANGE, FOLKS.  I CAN'T BELIEVE --

18      I'D BE SO TEMPTED -- EXCEPT I'VE GOT A TENTATIVE AND WE NEED TO

19      GET GOING ON THIS, I WOULD BE SO TEMPTED TO PUT THIS OVER.

20      YOU'RE CLEAR OF WHAT YOU GOT, BUT YOU'RE TELLING ME YOU DON'T

21      KNOW WHAT HAPPENED HERE AND SO FOR A LOT OF REASONS YOU WEREN'T

22      INCLINED TO INQUIRE, THAT'S CONCERNING.  I'M GOING TO GO AHEAD

23      WITH THIS AND ACCEPT THE FACT THAT IF ANYTHING WAS TENDERED,

24      BUT YOU DON'T KNOW IF THERE WAS ANYTHING TENDERED --

25           MR. LOBBIN:  WELL, WE DO KNOW ABOUT THE MATERIALS IN
```

1    THE RECORD CERTAINLY.

2         THE COURT:  OKAY.  I'M GOING TO GET TO THOSE IN A

3    MINUTE.

4         MR. GERSHENSON:  THOSE WEREN'T TENDERED TO COOLEY,

5    JUST TO BE CLEAR.

6         THE COURT:  I'M SORRY?

7         MR. GERSHENSON:  THE MATERIALS THAT HE'S SAYING WERE IN

8    THE RECORD I BELIEVE HE'S SAYING WERE TENDERED TO AXIOM ZEN

9    WHICH IS --

10        THE COURT:  EXACTLY.  I'M TALKING TENDERED TO COUNSEL.

11   I'M ONLY CONCERNED NOW ABOUT COUNSEL, NOT AXIOM, MR. LOBBIN.

12        MR. LOBBIN:  SO COOLEY WAS -- MY CLIENT STARCOIN

13   DISCUSSED A POSSIBLE ENGAGEMENT WITH COOLEY FOR SURE.  AN

14   ENGAGEMENT WAS NEVER ENTERED, AND THEY FOUND -- OUR CLIENT

15   FOUND THEIR WAY TO US MANY MONTHS LATER.  WE NOTICED THAT

16   COOLEY HAD ENTER AN APPEARANCE IN THIS MATTER AS OPPOSING

17   COUNSEL, AND WE THOUGHT, WELL, GEE, THEY USED TO ALMOST BE OUR

18   CLIENT'S LAWYER, NOW THEY'RE OPPOSING US, SO IS THERE AN ISSUE

19   OF A CONFLICT?  DO WE WANT TO RAISE THAT?  AND WE DECIDED THAT

20   WE DIDN'T HAVE ENOUGH FACTS TO RAISE THAT ISSUE.

21        THE COURT:  WHAT DID YOU NEED TO KNOW?

22        MR. LOBBIN:  WHETHER COOLEY HAD POSSESSION OF

23   CONFIDENTIAL INFORMATION THAT COULD BE USED ADVERSELY TO US IN

24   THIS MATTER.

25        THE COURT:  AREN'T YOU IN THE BEST POSITION TO KNOW

1      WHAT YOUR CLIENT GAVE TO COOLEY, SIR?

2            MR. LOBBIN:  YES, AND WE INVESTIGATED THAT AND

3      DETERMINED IT WAS NOT ENOUGH TO RAISE AN ISSUE IN THIS

4      PROCEEDING.

5            THE COURT:  OKAY.  YOU SATISFIED WITH THAT, SIR?

6            MR. GERSHENSON:  I AM.

7            THE COURT:  YOU'RE MORE POSITIVE OF YOUR POSITION

8      BECAUSE YOU THINK THEY NEVER ENGAGED.  LET'S KEEP GOING.  THANK

9      YOU.  SO THAT ISSUE'S REMOVED.  NOBODY IS GOING TO RAISE THAT.

10           SO HERE'S THE TENTATIVE, FOLKS.  TURNING TO PLAINTIFF

11     FOUNDER STARCOIN'S MOTION FOR PRELIMINARY INJUNCTION, THE COURT

12     IS TENTATIVELY INCLINED TO DENY PLAINTIFF'S REQUEST FOR A

13     PRELIMINARY INJUNCTION.

14           AS THE PARTIES ARE AWARE, A PARTY SEEKING A PRELIMINARY

15     INJUNCTION MUST ESTABLISH FOUR FACTORS:  FIRST, THE LIKELIHOOD

16     OF SUCCESS ON THE MERITS.  SECOND, THE LIKELIHOOD OF SUFFERING

17     IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF.  THIRD,

18     THE BALANCE OF EQUITIES TIP IN PLAINTIFF'S FAVOR.  AND FOURTH,

19     THAT AN INJUNCTION IS IN THE PUBLIC INTEREST.

20           CONCERNING PLAINTIFF'S LIKELIHOOD OF A SUCCESS ON THE

21     MERITS, THE COURT IS TENTATIVELY INCLINED TO FIND THAT

22     PLAINTIFF HAS NOT ESTABLISHED IT HAS A TRADE SECRET.  PLAINTIFF

23     CLAIMS THAT ITS TRADE SECRET CONSISTS OF LICENSING DIGITAL

24     COLLECTIBLES BASED ON ATHLETES, ENTERTAINERS, AND CELEBRITIES.

25     THERE ARE TWO SEPARATE REASONS WHY THIS IS NOT A TRADE SECRET.

1      FIRST, THE MATERIALS THAT MR. FEINBLATT TRANSPORTED TO

2      DEFENDANT SIMPLY DO NOT REFLECT THE TRADE SECRET PLAINTIFF

3      CLAIMS TO HAVE.  THE SLIDE DECK AND FOLLOW-UP EMAIL REFLECT A

4      BUSINESS MODEL THAT COMMODITIZES ENTERTAINERS THROUGH A TOKEN

5      OFFERING.  ONE SLIDE STATES THAT PLAINTIFF WOULD CREATE

6      SECURITY COMPLIANT TOKENS AND HOST THEM ON A REGULATED

7      EXCHANGE.  THE SLIDE DECK REFLECTS A BUSINESS MODEL TO CREATE

8      AN INITIAL COIN OFFERING OR A TOKEN OFFERING.  THIS IS NOT THE

9      SAME AS LICENSING DIGITAL COLLECTIBLES USING ENTERTAINERS,

10     ATHLETES, AND CELEBRITIES.

11          SECOND, THE LAW IS WELL ESTABLISHED THAT INFORMATION

12     THAT IS PUBLIC KNOWLEDGE OR GENERALLY KNOWN IN AN INDUSTRY

13     CANNOT BE A TRADE SECRET.  THE COURT IS INCLINED TO FIND THAT

14     NO MATTER HOW PLAINTIFF DEFINES ITS TRADE SECRET, THE IDEA IS

15     PUBLIC KNOWLEDGE.  FOR EXAMPLE, DEFENDANT PRODUCED SEVERAL

16     PUBLICLY AVAILABLE ARTICLES DESCRIBING HOW PEOPLE CAN USE TOKEN

17     OR CRYPTOCURRENCY TO INVEST IN ATHLETES, MUSICIANS AND

18     CELEBRITIES.  THESE ARTICLES DEMONSTRATE THAT THE IDEA

19     DESCRIBED IN THE SLIDE DECK WAS PUBLIC KNOWLEDGE BEFORE

20     FEBRUARY 8, 2018.

21          ALTERNATIVELY, IF THE COURT WERE TO ACCEPT PLAINTIFF'S

22     POSITION THAT IT HAS A TRADE SECRET IN LICENSING DIGITAL

23     COLLECTIBLES, THEN SUCH A POSITION IS ALSO PUBLIC KNOWLEDGE.

24     LICENSING CELEBRITIES IS USED IN COUNTLESS INDUSTRIES.

25     PLAINTIFF HAS NOT DEMONSTRATED WHAT, SPECIFICALLY, IS UNIQUE OR

1     SECRET ABOUT ITS OWN CELEBRITY LICENSING IDEA.

2          WITH REGARD TO WHETHER DEFENDANT MISAPPROPRIATED

3     PLAINTIFF'S TRADE SECRET, THE COURT IS INCLINED TO FIND THAT

4     DEFENDANT ARRIVED AT ITS PRODUCT AND BUSINESS MODEL BEFORE

5     PLAINTIFF SENT THE SLIDE DECK TO DEFENDANT.  THIS IS EVIDENT

6     FROM THE ARTICLE DEFENDANT'S CHIEF OPERATING OFFICER PUBLISHED

7     IN OCTOBER OF 2017.  THAT ARTICLE SAID, "WE ARE THE FLAG BEARER

8     FOR THE REST OF THIS ECOSYSTEM IN TERMS OF GETTING CELEBRITIES

9     TO ASSOCIATE WITH KITTIES AND THE ETHEREUM NETWORK."  MOREOVER,

10    DEFENDANT PRODUCES EVIDENCE OF MULTIPLE ATTEMPTS TO REACH OUT

11    TO CELEBRITIES BEFORE PLAINTIFF SENT ITS SLIDE DECK.

12         FINALLY, THE CONVERSATION THAT ULTIMATELY LED TO

13    DEFENDANT'S ATTEMPT TO LICENSE STEPH CURRY BEGAN BEFORE

14    PLAINTIFF SENT ITS FOLLOW-UP EMAIL WITH MR. CURRY'S LIKENESS.

15    THESE FACTS REVEAL THAT DEFENDANT LIKELY ARRIVED AT THE IDEA OF

16    LICENSING CELEBRITIES FOR DIGITAL COLLECTIBLES INDEPENDENTLY OF

17    PLAINTIFF.

18         AS TO THE ISSUE OF CAUSATION, THE COURT IS TENTATIVELY

19    INCLINED TO FIND THAT PLAINTIFF HAS NOT DEMONSTRATED CAUSATION

20    BETWEEN A MISAPPROPRIATION AND THE HARM CAUSED TO PLAINTIFF.

21    AS DEFENDANT POINTS OUT, THERE IS AN ENTITY NOT PRESENTLY

22    BEFORE THE COURT -- DAPPER LABS -- THAT LAUNCHED CRYPTOKITTY

23    WITH MR. CURRY'S LIKENESS.  THE HARM IN A TRADE SECRET CASE

24    DERIVES FROM PUBLIC USE OR DISCLOSURE OF A TRADE SECRET AND IT

25    WAS DAPPER LABS, NOT AXIOM, THAT LAUNCHED MR. CURRY'S

1    CRYPTOKITTY TO THE GENERAL PUBLIC.  THIS SUGGESTS THE HARM FROM

2    FLOWS FROM DAPPER, NOT AXIOM, AND PLAINTIFF LIKELY CANNOT SHOW

3    DEFENDANT CAUSED THE HARM.

4         NEXT, THE COURT IS TENTATIVELY INCLINED TO FIND IT

5    UNLIKELY THAT PLAINTIFF WOULD SUFFER IRREPARABLE HARM IF THE

6    COURT WERE TO DENY ITS REQUEST FOR A PRELIMINARY INJUNCTION.

7    PLAINTIFF HAS NOT PRODUCED ANY EVIDENCE THAT IT HAD OR WILL

8    HAVE A PRODUCT THAT COULD COMPETE IN THE SAME MARKET AS

9    DEFENDANT.  ACCORDINGLY, PLAINTIFF HAS NOT DEMONSTRATED THAT IT

10   HAS LOST GOODWILL OR CUSTOMERS TO DEFENDANT.  WITHOUT

11   ADDITIONAL FACTS, CLAIMS OF IMMINENT, IRREPARABLE INJURY REMAIN

12   SPECULATIVE.

13        PLAINTIFF RAISES THE ISSUE OF TWO INVESTORS WHO

14   INTIMATED THAT THEY WOULD SIGN WITH PLAINTIFF, BUT SIGNED WITH

15   DEFENDANT.  WHILE THIS HARM IS MORE TANGIBLE, DEFENDANT HAS

16   DEMONSTRATED THAT THESE SAME INVESTORS HAD ALREADY EXPRESSED AN

17   INTEREST BEFORE THE FEBRUARY 8TH EMAIL.  MOREOVER, IF PLAINTIFF

18   WERE ABLE TO PREVAIL, THIS INJURY LIKELY COULD BE REMEDY BY

19   MONETARY DAMAGES RATHER THAN AN INJUNCTION.

20        WITH RESPECT TO BALANCE OF EQUITIES, THE COURT IS

21   TENTATIVELY INCLINED TO FIND THAT PLAINTIFF HAS NOT ESTABLISHED

22   THE EQUITIES TIP IN ITS FAVOR.  AS NOTED EARLIER, PLAINTIFF HAS

23   NOT DEMONSTRATED IT HAS A PRODUCT NEARING RELEASE.  ON THE

24   OTHER HAND, DEFENDANT HAS BOTH A PRODUCT AND HAS ATTEMPTED TO

25   PURSUE CELEBRITIES TO ASSOCIATE WITH CRYPTOKITTIES.  AN

1      INJUNCTION AGAINST DEFENDANT CAUSES DIRECT AND IMMEDIATE HARM.

2      PLAINTIFF'S HARM IS MORE SPECULATIVE GIVEN THE LACK OF EVIDENCE

3      CONCERNING A FORTHCOMING PRODUCT.

4           FURTHER, THE COURT IS INCLINED TO FIND THAT PLAINTIFF'S

5      PROPOSED INJUNCTION CREATES ENFORCEMENT DIFFICULTIES.

6      PLAINTIFF STATES THAT IT SEEKS TO ENJOIN DEFENDANT FROM

7      CREATING AND SELLING CONTENT DERIVED FROM PLAINTIFF'S

8      CONFIDENTIAL INFORMATION.  THIS COULD BE QUITE BROAD IF THE

9      INJUNCTION COVERS ALL CELEBRITY LICENSES.  IF, ALTERNATIVELY,

10     THE SCOPE IS LIMITED TO A CRYPTOKITTY BASED ON MR. CURRY, THEN

11     INJUNCTION IS MOST LIKELY MOOT AS DAPPER LABS HAD TO PULL THE

12     CURRY CRYPTOKITTY FROM ITS WEBSITE.

13          THE COURT WILL ASK PLAINTIFF, IN QUESTIONS, TO DEFINE

14     THE SCOPE OF ITS PROPOSED INJUNCTION, ALONG WITH OTHER

15     QUESTIONS, AND WE'LL GET TO THAT SHORTLY.

16          IN SUM, THE COURT IS TENTATIVELY INCLINED TO FIND THAT

17     PLAINTIFF HAS NOT CARRIED ITS BURDEN TO ESTABLISH THE

18     LIKELIHOOD OF SUCCESS ON THE MERITS, IRREPARABLE HARM, OR THAT

19     THE BALANCE OF EQUITIES TIPS IN ITS FAVOR.  THUS, THE COURT IS

20     INCLINED TO FIND THAT IT IS NOT IN THE PUBLIC INTEREST TO ISSUE

21     AN INJUNCTION.

22          THE PARTIES ARE REMINDED THAT THIS IS ONLY THE COURT'S

23     TENTATIVE OPINION AND IS SUBJECT TO CHANGE IN LIGHT OF THE

24     ARGUMENTS PRESENTED TODAY.  I HAVE QUESTIONS FOR BOTH SIDES,

25     AND I WOULD ASK YOU TO ONLY ANSWER THE QUESTION I POSE BECAUSE

1    WHATEVER TIME REMAINS BETWEEN NOW AND THE NEXT MATTER, WHICH IS

2    SET AT 2:30, I'LL ALLOW YOU TO SPLIT THE TIME AND TELL THE

3    COURT ANYTHING THAT YOU WOULD LIKE TO TELL ME.

4         SO WITH THAT, I WOULD LIKE TO START WITH PLAINTIFFS --

5    MY QUESTIONS START WITH PLAINTIFFS.  IF YOU WOULD LIKE TO TAKE

6    THE PODIUM, MR. RICHARDSON.  THANK YOU, SIR.

7         MR. RICHARDSON:  GOOD AFTERNOON, YOUR HONOR.

8         THE COURT:  GOOD AFTERNOON.  MY FIRST QUESTION RELATES

9    TO THE SLIDE DECK, WHICH I HAVE HERE.  I WANT TO KNOW VERY

10   PRECISELY WHAT IS YOUR TRADE SECRET AND WHERE IN THIS SLIDE

11   DECK IS IT EXPLICITLY DISCLOSED?

12        MR. RICHARDSON:  WELL, YOUR HONOR, IN YOUR TENTATIVE,

13   WHICH OBVIOUSLY WE RESPECT, BUT WE DISAGREE WITH A FEW CERTAIN

14   POINTS ON THE TENTATIVE.

15        THE COURT:  OF COURSE.

16        MR. RICHARDSON:  FIRST OFF, THE TOKEN ASPECT OF OUR

17   CLIENT'S BUSINESS IS ONLY A SMALL PART OF IT, AND THAT'S

18   ACTUALLY KIND OF BEEN PUT TO THE WAYSIDE FOR NOW.  REALLY THE

19   FOCUS OF OUR CLIENT'S BUSINESS IS DIGITAL COLLECTIBLES.

20        THE COURT:  I'M GOING TO STOP YOU, SIR, BECAUSE YOU'RE

21   GOING TO GET TO TELL ME WHAT YOU WANT TO TELL ME LATER.  I'M

22   ASKING YOU WHAT IS YOUR TRADE SECRET AND WHERE IN THIS SLIDE

23   DECK, WHICH IS WHAT THIS MOTION IS BASED ON PRETTY MUCH, WHERE

24   DO YOU DISCLOSE THAT?  BECAUSE I COULDN'T FIND IT.  YOU'VE GOT

25   TO UNDERSTAND THAT.

1           MR. RICHARDSON:  SURE, YOUR HONOR.  OUR TRADE SECRET IS

2      PARTNERING AND USING CELEBRITY LIKENESSES, CREATING LICENSES

3      WITH THESE CELEBRITIES, ATHLETES, ENTERTAINERS TO DEVELOP

4      DIGITAL COLLECTIBLES, CRYPTOCOLLECTIBLES.

5           THE COURT:  OKAY.  THAT'S YOUR TRADE SECRET.

6           MR. RICHARDSON:  YES.

7           THE COURT:  WHERE IN HERE IS THAT DISCLOSED, SIR?

8           MR. RICHARDSON:  IF YOU LOOK AT -- AND I DON'T HAVE THE

9      EXACT PAGE IN FRONT OF ME, BUT THE PAGE THAT HAS A PRODUCT

10     MOCK-UP WITH CERTAIN CELEBRITIES AND ATHLETES SPECIFICALLY.

11          THE COURT:  THIS WASN'T PART OF THE ORIGINAL SLIDE

12     DECK.  THIS WAS SENT LATER.  THIS HAS THE IMAGE OF STEPH CURRY

13     ON IT.

14          MR. RICHARDSON:  YES.

15          THE COURT:  SO WHERE -- THIS IS IT?

16          MR. RICHARDSON:  THAT'S PART OF IT, YOUR HONOR.

17          THE COURT:  I MEAN, BASICALLY, FORGIVE ME FOR BEING

18     TOUGH, BUT THIS IS CRITICAL TO THIS WHOLE CASE.  THIS IS YOUR

19     TRADE SECRET.

20          MR. RICHARDSON:  NO, THERE'S OTHER PAGES IN THERE THAT

21     DISCUSS --

22          THE COURT:  SHOW ME WHERE IT IS.

23          MR. RICHARDSON:  IF YOU TURN TO THE SOLUTIONS PAGE.

24          THE COURT:  I'VE GOT IT HERE, A ROAD MAP, A SOLUTIONS

25     PAGE.  OKAY, I'M THERE.

1          MR. RICHARDSON:  RIGHT.  AND ON THE SOLUTIONS PAGE IT

2     DISCUSSES THE EXACT BUSINESS MODEL AND MARKETING PLAN THAT

3     STARCOIN IS EMPLOYING AND PLANNING ON EMPLOYING TO CREATE ITS

4     BUSINESS AND ESTABLISH ITSELF --

5          UNIDENTIFIED MAN:  IT'S THE WHOLE --

6          THE COURT:  SIR, WE CAN'T HAVE YOU COMMENT FROM THE

7     AUDIENCE.  I UNDERSTAND THIS IS IMPORTANT.

8          MR. RICHARDSON:  AND ALSO ON THE BUSINESS MODEL PAGE.

9          THE COURT:  YOU UNDERSTAND, BECAUSE YOU'VE READ THIS

10    JUST THE WAY I HAVE, THAT THIS TALKS ABOUT COMMODITIZATION OF

11    ENTERTAINMENT, AND BUSINESSES, AND ENTERTAINERS,

12    COMMODITIZATION THROUGH A TOKEN -- A REGULATED TOKEN AND

13    CREATING A MARKETPLACE.  IT DOES NOT TALK ABOUT CELEBRITY

14    IMAGES AND COLLECTIBLES.  IT'S VERY DIFFERENT.

15         MR. RICHARDSON:  WELL, IT DOES IN THE BUSINESS MODEL

16    PART.

17         THE COURT:  LET'S GO THERE BECAUSE IT'S NOT ON THIS

18    PAGE.  LET'S GO TO BUSINESS MODEL.  OKAY, SO SHOW ME ON THE

19    BUSINESS MODEL.

20         MR. RICHARDSON:  ON THE BUSINESS MODEL PAGE, IT

21    DISCUSSES THE DEVELOPMENT OF CRYPTOCOLLECTIBLES.

22         THE COURT:  NO, IT DOESN'T EVER TALK ABOUT

23    COLLECTIBLES.  THERE IS NOTHING IN THIS DOCUMENT THAT TALKS

24    ABOUT COLLECTIBLES.  IT TALKS ABOUT TOKENS.  IT TALKS ABOUT

25    COMMODITIZING CELEBRITIES, BE THEY ENTERTAINERS, ATHLETES,

```
1        WHATEVER.  IT TALKS ABOUT A TOKEN.  IT TALKS ABOUT A REGULATED
2        MARKET.  THAT'S DIFFERENT THAN A COLLECTIBLE THAT HAS VALUE
3        THAT MAY BE ENHANCED WITH A CELEBRITY.
4              MR. RICHARDSON:  RIGHT, YOUR HONOR, AND I THINK YOU
5        TOUCHED ON IT WITH THE COMMODITIZATION.  NOW, THERE'S TWO
6        ASPECTS OF THE COMMODITIZATION.  THERE'S WHAT WE WERE TALKING
7        ABOUT WITH THE CREATION OF THE TOKENS AND THERE'S ALSO THE
8        COMMODITIZATION OF -- I WASN'T NECESSARILY PLANNING ON SPEAKING
9        SPECIFICALLY ABOUT THE TRADE SECRETS TODAY BECAUSE OF THE
10       PUBLIC FORUM.
11             THE COURT:  WE'RE IN A CLOSED COURTROOM RIGHT NOW, AND
12       YOU'RE ASKING ME TO SHUT THEM DOWN BASED ON YOUR TRADE SECRET.
13       SO I DON'T KNOW IF WE NEED TO GO ANY FARTHER IF YOU CAN'T TELL
14       ME WHAT THE TRADE SECRET IS AND HOW IT IS YOU DISCLOSED IT TO
15       AXIOM.
16             MR. RICHARDSON:  RESPECTFULLY, YOUR HONOR, WE'RE NOT
17       TRYING TO SHUT THEM DOWN.
18             THE COURT:  THAT MAY BE A LITTLE BIT STRONG, BUT YOU'RE
19       ASKING ME TO ENJOIN THEM, A PRELIMINARY INJUNCTION.
20             MR. RICHARDSON:  YES, YOUR HONOR.  THEY'VE ESTABLISHED
21       THEIR CRYPTOKITTIES BUSINESS, SECURED $12 MILLION IN FUNDING
22       WITHOUT ANY CELEBRITY PARTNERSHIPS OR LIKENESSES.  THE
23       CURRYKITTY DID NOT COME UNTIL MUCH AFTER THE CREATION OF
24       CRYPTOKITTIES, SO IN TERMS OF THE BALANCING OF THE --
25             THE COURT:  KEEP GOING.
```

1    MR. RICHARDSON:  IN TERMS OF THE BALANCING OF THE

2    HARDSHIPS, AXIOM ZEN WILL SUFFER NO HARDSHIPS IF THIS

3    INJUNCTION IS CREATED.

4    THE COURT:  WELL, WE'RE NOT ANYWHERE CLOSE TO THAT YET.

5    YOU HEARD THE COURT'S TENTATIVE.  BASICALLY THIS DOCUMENT, THIS

6    SLIDE DECK DOES NOT CONTAIN, SIR, AND I'M TRYING TO SAY THIS AS

7    KIND AS I CAN, DOES NOT CONTAIN WHAT YOU SAY IT CONTAINS.  IT

8    DOES NOT TALK ABOUT COLLECTIBLES.  IT TALKS ABOUT TOKENS.  IT

9    TALKS ABOUT A COMMODITY.  IT TALKS ABOUT A MARKET, AND THIS IS

10   WHAT YOU SENT TODAY.

11   THEN AFTER THE DOCUMENT IS SENT, I'LL GIVE YOU YOU SENT

12   ANOTHER PAGE THAT HAS AN IMAGE OF STEPH CURRY, BUT THEY HAD

13   CONTACTED MR. CURRY BEFOREHAND.

14   MR. RICHARDSON:  AND THEN IF YOU ALSO LOOK ON PAGE 6 OF

15   THE EXCHANGES -- AND AGAIN I WOULD LIKE TO REITERATE THAT THE

16   COMMODITIZATION HAS MULTIPLE COMPONENTS, SO THE COMMODITIZATION

17   IN TERMS OF DIGITAL COLLECTIBLES IT ALLOWS CELEBRITIES AND

18   ATHLETES AND OTHER ENTERTAINERS TO WORK WITH STARCOIN TO

19   DEVELOP A UNIQUE DIGITAL COLLECTIBLE, A CRYPTOCOLLECTIBLE.

20   THE COURT:  SHOW ME WHERE THAT'S IN HERE.  IT'S NOT IN

21   HERE, SIR.

22   MR. RICHARDSON:  THAT'S WHAT COMMODITIZATION MEANS,

23   YOUR HONOR.

24   THE COURT:  HOW WOULD ONE KNOW THAT?

25   MR. RICHARDSON:  WELL, AXIOM ZEN WORKS IN THIS SPHERE.

1    STARCOIN WORKS IN THIS SPHERE.  IT WAS KNOWN BETWEEN THE

2    PARTIES WHAT THEY WERE DISCUSSING.

3         THE COURT:  I DON'T THINK THE DISCUSSIONS WENT VERY

4    FAR.  OKAY.  SO YOU THINK THIS EMBODIES A TRADE SECRET.  YOU

5    THINK THAT WHEN YOU TALK ABOUT A TOKEN, AND COMMODITIZATION

6    USING TOKENS, THAT THAT REPRESENTS A COLLECTIBLE.

7         MR. RICHARDSON:  AGAIN, YOUR HONOR, STARCOIN HAS PUT

8    THE TOKEN ASPECT KIND OF ON THE BACK BURNER.

9         THE COURT:  HOW WOULD I KNOW THAT?  YOU'RE TELLING ME

10    THAT TODAY.

11         MR. RICHARDSON:  YES.  WE DIDN'T REALLY DISCUSS THE

12    TOKEN ASPECT IN OUR BRIEFING.  WE WERE DISCUSSING THE

13    CRYPTOCOLLECTIBLE ASPECT OF IT.  WE'RE NOT ARGUING ABOUT --

14         THE COURT:  NOWHERE DO YOU DEFINE WHAT COMMODITIZATION

15    MEANS TO YOU.  NOWHERE DO YOU SAY THAT IT COULD BE A TOKEN OR

16    IT COULD BE -- HOW WOULD ANYBODY HAVE KNOWN THAT, SIR?  MAYBE

17    THEY KNEW IT, I DON'T KNOW, I HAVEN'T TALKED TO THEM YET.

18         MR. RICHARDSON:  WELL, THAT'S OUR ARGUMENT, YOUR HONOR,

19    IS THAT THE PARTIES KNEW WHAT THEY WERE DISCUSSING.

20         AND ONE THING I WOULD LIKE TO TOUCH ON, WHILE WE

21    BELIEVE THAT THIS IS A PROTECTABLE TRADE SECRET, IF IN YOUR

22    OPINION YOU DO NOT THINK IT'S A TRADE SECRET, AND YOU DO NOT

23    THINK THAT WE COULD PROCEED ON THE MERITS OF THAT, WE THINK WE

24    HAVE A VERY STRONG CASE IN TERMS OF LEARNING SOMETHING WITH A

25    MUTUAL NON-DISCLOSURE AGREEMENT BECAUSE THERE WAS NO

1     CONFIDENTIAL INFORMATION THAT WAS SENT.

2          THE COURT:  LET'S SLOW DOWN FOR A MINUTE.  SO BASICALLY

3     YOU DID WHAT YOU COULD WITH MY FIRST QUESTION.  I UNDERSTAND

4     YOUR ANSWER TO THE EXTENT I RECEIVED AN ANSWER, TO BE HONEST.

5          MY NEXT QUESTION IS, HOW -- WELL, YOUR BUSINESS MODEL,

6     IN MY VIEW, LOOKING AT THIS, IS DIFFERENT -- WHAT YOU DISCLOSED

7     IN THIS SLIDE DECK IS DIFFERENT, IT IS NOT THE SAME AS

8     DEFENDANT'S BUSINESS MODEL.  THEY'RE DOING DIGITAL COLLECTIBLES

9     LICENSING CELEBRITIES.

10         MR. RICHARDSON:  NOT REALLY, YOUR HONOR, THEY WERE

11    DOING JUST CRYPTOKITTIES, NOT LICENSE WITH CELEBRITIES, AND NOT

12    UNTIL AFTER THEY RECEIVED OUR CONFIDENTIAL INFORMATION DID THEY

13    THEN WORK WITH STEPHAN CURRY TO CREATE THE CURRYKITTY.

14         THE COURT:  THEY STARTED THAT BEFORE YOU EVER CONTACTED

15    THEM.

16         MR. RICHARDSON:  WE REVIEWED THE MATERIALS, YOUR HONOR,

17    AND WE'RE STILL -- IT STILL SEEMS LIKE A VERY ODD COINCIDENCE.

18         THE COURT:  ISN'T IT TRUE, SIR, THAT LICENSING

19    CELEBRITIES IN A BLOCKCHAIN INDUSTRY IS SOMETHING THAT'S

20    GENERALLY KNOWN, IT'S NOT A TRADE SECRET?

21         MR. RICHARDSON:  WELL, AGAIN, YOUR HONOR, EVEN IF IT'S

22    NOT A TRADE SECRET, THERE WAS STILL AN MNDA SIGNED, AND, YOU

23    KNOW, THE PARTIES STILL HAD A DUTY OF GOOD FAITH TO EACH OTHER,

24    SO IF AXIOM ZEN IN THEIR MIND BELIEVED THAT WHAT THEY RECEIVED

25    WAS NOT CONFIDENTIAL INFORMATION, WHY DID THEY NOT LET MR.

```
1    FEINBLATT KNOW, AFTER THEY RECEIVED IT, "OH, YEAH, WE'VE BEEN
2    WORKING ON THIS.  THANKS ANYWAY"?  WHY DID THEY GO COMPLETELY
3    DARK ON HIM, NEVER REACH AGAIN OUT REGARDING THE COLLABORATION,
4    AND AFTER ONLY -- AFTER MR. FEINBLATT REPEATEDLY REACHED OUT TO
5    THEM, ASKING THEM, "WHAT'S GOING ON?  ARE WE GOING TO WORK
6    TOGETHER," THEY SAID, "OH, WE'RE A LITTLE BUSY.  WE CAN'T WORK
7    UNTIL JUNE OF THIS YEAR," AND THEN SHORTLY THEREAFTER THEY
8    RELEASED THE CURRYKITTY, WHICH WAS SHOCKING FOR US.
9         THE COURT:  I'M GOING TO MOVE ON BECAUSE I WANT TO HEAR
10   FROM THEM ON THIS, BUT YOU AND THE COURT AT LEAST NOW, AND THIS
11   IS ALL TENTATIVE, WE'RE JUST TALKING LIKE APPLES AND ORANGES.
12   I MEAN, HOW CAN YOU SAY THAT THERE'S IRREPARABLE HARM?  YOU
13   HAVE NO EVIDENCE OF LOSS OF GOODWILL, CUSTOMERS OR ANYTHING OF
14   THE SORT, SO HOW COULD YOU POSSIBLY QUANTIFY IRREPARABLE HARM?
15        MR. RICHARDSON:  WELL, WE DO HAVE A --
16        THE COURT:  LET ME ADD THIS, COUNSEL, AND THEN YOU CAN
17   ANSWER IT.
18        MR. RICHARDSON:  SURE.
19        THE COURT:  TWO VENTURE CAPITALISTS YOU CITE WERE
20   PLANNING ON SIGNING AND NOW THEY'VE SIGNED WITH DEFENDANT.
21   THAT'S BUSINESS.  THEY HAD ALREADY CONTACTED AXIOM.  THAT'S
22   BUSINESS, SIR.  I MEAN, I DON'T KNOW HOW YOU CAN SAY THAT'S
23   IRREPARABLE INJURY.  SO GO AHEAD, CONVINCE ME.
24        MR. RICHARDSON:  IT'S BUSINESS, BUT IT'S OUR CLIENT'S
25   SWORN TESTIMONY THAT THE ONLY REASON THAT THIS BUSINESS TOOK
```

1    PLACE WAS BECAUSE CRYPTOKITTIES WAS THE FIRST TO MARKET FOR

2    THIS TYPE OF CELEBRITY LICENSED DIGITAL COMMODITY.  THE

3    IRREPARABLE HARM THAT OUR CLIENT SUFFERED WAS NOT BEING THE

4    FIRST TO MARKET.  THEY FOREVER LOST THAT ABILITY TO BE THE

5    FIRST TO MARKET.

6         NOW AS CURRYKITTIES HAS BEEN PULLED AND DIDN'T REALLY

7    GAIN A LOT OF MARKET TRACTION, THAT WE'RE AWARE OF, AN

8    INJUNCTION ALLOWING US TO PROCEED WITH OUR BUSINESS MODEL

9    COULD, IN FACT, ALLOW STARCOIN TO REGAIN THAT POSITION AS AN

10   INDUSTRY LEADER, AN INDUSTRY INNOVATOR.

11        THE COURT:  YOU BROUGHT UP THE INJUNCTION.  WHAT IS THE

12   SCOPE OF WHAT YOU'RE REQUESTING THIS COURT DO, SIR?

13        MR. RICHARDSON:  YOUR HONOR, WE'RE NOT TRYING TO

14   OVERREACH.  WE WOULD LIKE A VERY NARROWLY TAILORED INJUNCTION.

15        THE COURT:  TELL ME.

16        MR. RICHARDSON:  ALL STARCOIN IS ASKING IS THAT, FIRST,

17   THAT AXIOM EITHER RETURNS OR DESTROYS THE CONFIDENTIAL

18   INFORMATION THAT WAS SENT TO THEM, AND IS PRECLUDED FROM USING

19   THE CONFIDENTIAL INFORMATION UNTIL THIS CASE --

20        THE COURT:  WHAT CONFIDENTIAL INFORMATION?

21        MR. RICHARDSON:  ALL THE MATERIALS THAT WERE SENT TO

22   THEM.

23        THE COURT:  THIS, THE SLIDE DECK?

24        MR. RICHARDSON:  YES, THE SLIDE DECK AND THE EMAIL

25   CORRESPONDENCES, YES.

1          AND SECOND, STARCOIN REQUESTS AN ORDER PREVENTING AXIOM

2     FROM FURTHER IMPLEMENTING THE STARCOIN BUSINESS MODEL FOR THEIR

3     OWN BENEFIT.  THAT'S ALL WE'RE ASKING, YOUR HONOR.

4          THE COURT:  WHAT IS THAT BUSINESS MODEL?  I DON'T

5     UNDERSTAND WHAT IT IS.  YOU TOLD ME IT'S NOT FROM WHAT I

6     UNDERSTOOD FROM THE SLIDE DECK.  YOU SAID SO MUCH MORE IS

7     CONTAINED IN THE CONCEPT OF THE TOKEN OR COMMODITIZATION, SO

8     WHAT DO YOU THINK YOU'RE ASKING THEM NOT TO DO?

9          MR. RICHARDSON:  I ACTUALLY CONTEND THAT IT'S LESS

10    BROAD, YOUR HONOR, THAT WE'RE JUST ASKING THAT AXIOM IS NOT

11    ALLOWED TO PARTNER AND LICENSE THEIR CRYPTOKITTIES, THEIR

12    CRYPTOCOLLECTIBLES WITH CELEBRITIES, ATHLETES AND ENTERTAINERS

13    BECAUSE THEY GOT THAT IDEA FROM OUR CLIENT.

14         THE COURT:  WELL, COUNSEL, THAT'S QUITE A STRETCH, SIR.

15    I MEAN, I DON'T KNOW THAT LICENSING WITH CELEBRITIES ON

16    ANYTHING CAN BE A TRADE SECRET BECAUSE EVERYBODY DOES IT.  MR.

17    CURRY IS OUT THERE EVERYWHERE.  HOW CAN YOU SAY THAT?  IT JUST

18    -- OKAY, THAT'S FINE.  THAT'S YOUR VIEW OF THINGS, AND LET ME

19    HEAR FROM THEM.  I'M JUST CONCERNED.

20         MR. RICHARDSON:  MAY I ADD ONE MORE THING, YOUR HONOR.

21         THE COURT:  SURE.

22         MR. RICHARDSON:  YOU ARE CORRECT ABSOLUTELY IN THAT

23    USING CELEBRITY LIKENESSES IS INHERENT TO MANY INDUSTRIES.

24         THE COURT:  TOOTHPASTE, TENNIS SHOES, CRYPTOKITTIES.

25         MR. RICHARDSON:  SURE.  ABSOLUTELY.  BUT I WILL POINT

1      OUT THAT THE MAIN DIFFERENCE IS THAT IT WAS NOT USED IN

2      CRYPTOCOLLECTIBLES UNTIL THE CURRYKITTY.  NOW, IN THE PAPERS

3      DEFENDANTS INTRODUCED EVIDENCE OF A COMPANY CALLED

4      CRYPTOCELEBRITIES AND CONTEND THAT THEY WERE ACTUALLY THE FIRST

5      ONES TO USE THIS BUSINESS MODEL, BUT AS WE DID OUR OWN RESEARCH

6      INTO THIS COMPANY CRYPTOCELEBRITIES, IT BECAME CLEAR THAT THEY

7      NEVER ACTUALLY PARTNERED WITH CELEBRITIES, IT WAS BASICALLY

8      LIKE A -- THEY WERE BASICALLY USING THESE CELEBRITY LIKENESSES

9      WITHOUT ANY LICENSES TO DO SO.

10            THE COURT:  LET'S SUPPOSE YOU'RE RIGHT ON THIS FOR A

11     MOMENT.  DOES IT MAKE ANY DIFFERENCE TO YOU THAT DAPPER LABS

12     WAS THE ONE THAT RELEASED THE CRYPTOCURRY?

13            MR. RICHARDSON:  I DON'T THINK SO, YOUR HONOR.

14            THE COURT:  IT'S NOT AN ENTITY THAT'S BEFORE ME.

15            MR. RICHARDSON:  WELL, FIRST OF ALL, THE MNDA WAS

16     SIGNED BETWEEN AXIOM AND STARCOIN, AND SO WE HAD NEVER HEARD OF

17     DAPPER LABS UNTIL DEFENDANT FILED ITS PAPERS.  SO AS FAR AS WE

18     KNEW, WE WERE ONLY DOING BUSINESS WITH AXIOM.

19            THE COURT:  YOU WEREN'T DOING BUSINESS WITH THEM, YOU

20     SENT THEM SOME STUFF.  YOU DIDN'T DO BUSINESS WITH THEM.

21            MR. RICHARDSON:  WE WERE ATTEMPTING TO WORK ON A

22     COLLABORATION.

23            THE COURT:  YOU WANTED TO DO BUSINESS WITH THEM.

24            MR. RICHARDSON:  SURE.  ABSOLUTELY.

25            THE COURT:  OKAY.

1        MR. RICHARDSON:  AND I GUESS ADDRESSING YOUR POINT

2    ABOUT DAPPER LABS --

3        THE COURT:  LET'S SUPPOSE I AGREED WITH YOU ON

4    EVERYTHING AND SAID, "OKAY, I'M GOING TO ISSUE THIS ORDER," ARE

5    THEY THE RIGHT PEOPLE TO ISSUE THE ORDER AGAINST, AXIOM?  I

6    DON'T THINK SO.

7        MR. RICHARDSON:  AXIOM SIGNED THE MUTUAL NON-DISCLOSURE

8    AGREEMENT, WHO ARE WE DOING BUSINESS WITH -- ATTEMPTING TO DO

9    BUSINESS WITH, SORRY, IF IT WAS NOT AXIOM?  THEY NEVER INFORMED

10   US THAT IT WAS ACTUALLY DAPPER LABS THAT CRYPTOKITTIES WERE

11   UNDER.  AND IF YOU LOOK AT ALL OF THE PRESS RELEASES, IT'S

12   ALWAYS AXIOM ZEN'S CRYPTOKITTIES.  THERE IS NEVER DAPPER LABS.

13       THE COURT:  FINAL POINT BEFORE I HAVE SOME QUESTIONS

14   FOR DEFENDANT IS THIS:  ISN'T ALL THIS MOOT SINCE CRYPTOCURRY'S

15   BEEN PULLED?  CRYPTOCURRY'S NOT UP THERE ANYMORE, IS IT?

16       MR. RICHARDSON:  NO, IT'S NOT.

17       THE COURT:  WHOEVER DIDN'T HAVE THE AUTHORITY TO GIVE

18   MR. CURRY'S IMAGE.

19       MR. RICHARDSON:  WELL, THAT'S WHAT DEFENDANTS SAY, AND

20   WE'RE A BIT SKEPTICAL THAT THAT WAS THE EXACT REASON.  IT

21   DIDN'T --

22       THE COURT:  WE'RE NOT GOING TO SPECULATE.  I MEAN,

23   CRYPTOCURRY ISN'T UP ANYMORE, FOR WHATEVER REASON.  DOES THAT

24   MOOT THIS REQUEST?

25       MR. RICHARDSON:  NO, YOUR HONOR, IT DOES NOT MOOT THIS

1    REQUEST BECAUSE AXIOM IS STILL FREE TO PARTNER WITH STEPHAN

2    CURRY OR ANOTHER ATHLETE OR CELEBRITY IN THE FUTURE UNLESS

3    THEY'RE ENJOINED FROM DOING SO.

4         THE COURT:  SO YOU'RE ASKING THIS COURT TO ENJOIN THEM

5    FROM ANY LICENSING AGREEMENTS WITH ANY AND ALL CELEBRITIES,

6    ENTERTAINERS, SPORTS FIGURES, AS BROAD A TERM AS POSSIBLE,

7    THAT'S WHAT YOU'RE ASKING.

8         MR. RICHARDSON:  WELL, I WOULD SAY THAT IT'S NOT THAT

9    BROAD.

10        THE COURT:  TELL ME WHAT IT IS.

11        MR. RICHARDSON:  IT'S WHAT YOU SAID, BUT I WOULD

12   CONTEND THAT THAT'S NOT THAT BROAD.  IT'S ASKING THEM TO CARRY

13   ON THEIR BUSINESS AS USUAL.  THEY HAD NO CELEBRITY PARTNERSHIPS

14   BEFORE.

15        THE COURT:  THEY WERE LOOKING INTO IT BEFORE YOU CAME

16   ALONG, AND NOW YOU'RE SAYING THEY CAN'T DO THAT ANYMORE.  I

17   JUST WANTED TO SEE WHAT YOU'RE ASKING.  YOU'RE SAYING NO

18   CELEBRITIES, NO ATHLETES, NO PUBLIC FIGURES, WHOEVER YOU MIGHT

19   WANT TO LICENSE WITH.

20        MR. RICHARDSON:  CELEBRITIES, ATHLETES, ENTERTAINERS,

21   MUSICIANS.

22        THE COURT:  MUSICIANS, OKAY.  I JUST WANTED TO

23   UNDERSTAND THAT.  WHY DON'T YOU HAVE A SEAT, SIR, THANK YOU SO

24   MUCH.

25        MR. RICHARDSON:  THANK YOU, YOUR HONOR.

1          THE COURT:  HOW DO YOU RESPOND, COUNSEL, TO PLAINTIFF'S

2     ARGUMENT THAT NONE OF THE EVIDENCE YOU SUBMITTED EXPLICITLY

3     DISCLOSES "LICENSING" CELEBRITIES, BUT INSTEAD USES PHRASES

4     SUCH AS "RELATIONSHIPS" OR "ACTIONABLE PLANS" OR "ASSOCIATING"

5     WITH AXIOM?

6          MR. GERSHENSON:  SURE, YOUR HONOR.  I MEAN, FRANKLY,

7     THE TRADE SECRET HAS ALWAYS BEEN A SHAPE SHIFTER.  TO THE

8     EXTENT THAT WE UNDERSTAND IT IN THEIR REPLY, WE'RE ALLOWED TO

9     ASSOCIATE WITH ALL OF THESE ENTITIES, CELEBRITIES, STARS, AND

10    THE LIKE, WE'RE SOMEHOW NOT ALLOWED TO LICENSE, WHICH I THINK

11    MEANS WE'RE NOT ALLOWED TO PAY THEM.

12          NOW, I'M CONFUSED.  OUR BUSINESS MODEL AND REACHING OUT

13    TO THESE PEOPLE IS -- SURE, WE DESCRIBE IT AS A PARTNERSHIP AND

14    THE LIKE, YOU KNOW, CHARMAINE CROOKS HAPPENS TO BE CONNECTED TO

15    THE COMPANY, SO THAT MAY BE A SEPARATE CASE, BUT OF COURSE IF

16    YOU'RE LICENSING SOMEONE'S LIKENESS OR YOU'RE PARTNERING WITH

17    THEM TO USE THEIR LIKENESS, YOU PAY THEM.  THAT'S A LICENSE.

18    WE SAID, "THAT'S EXACTLY HOW WE DO OUR BUSINESS."

19          THE COURT:  SO IT'S A DISTINCTION WITHOUT A DIFFERENCE.

20          MR. GERSHENSON:  IT IS, YOUR HONOR.

21          THE COURT:  IF YOU "ASSOCIATE," YOU'RE BASICALLY IN A

22    LICENSING SITUATION OR YOU'RE PAYING THEM.

23          MR. GERSHENSON:  CORRECT, OR YOU'RE OPERATING

24    UNLICENSED, WHICH IS NOT WHAT WE DO AND NOT WHAT WE WANT TO DO.

25          THE COURT:  RIGHT.  DOES DAPPER LABS HAVE THE RIGHTS TO

1          THE CRYPTOKITTIES?  I WASN'T REALLY CLEAR ON DAPPER LABS.

2               MR. GERSHENSON:  SURE.  SO MY UNDERSTANDING -- AND IF I

3     MISSPEAK, PLEASE CORRECT ME.  MY UNDERSTANDING IS THAT DAPPER

4     LABS WAS A SEPARATE ENTITY, SPUN OFF.  IT ALLOWED FOR 20

5     EMPLOYEES TO GO FROM AXIOM TO DAPPER LABS AND THE INTELLECTUAL

6     PROPERTY WAS TRANSFERRED TO DAPPER LABS, SO DAPPER LABS, THAT

7     ENTITY, CONTROLS THE CRYPTOKITTIES.  I JUST DON'T WANT TO

8     MISSTATE ANYTHING.

9               MR. KRAUSE:  IF I MAY.

10              THE COURT:  COME OVER HERE AND USE THE MICROPHONE SO WE

11    CAN ALL HEAR YOU CLEARLY, SIR.  TELL US YOUR NAME, AGAIN.

12              MR. KRAUS:  STEVE KRAUSE.  SO DAPPER LABS WAS SPUN OFF

13    AT THE TIME OF THE INVESTMENT, RIGHT?  SO THE INVESTMENT WAS

14    MADE, AND AS PART OF THE INVESTMENT DAPPER LABS WAS CREATED.

15    THE MAJORITY OWNER OR AT LEAST A VERY LARGE PORTION IS OWNED BY

16    LAUNCH LABS, AXIOM ZEN, BUT AS ADAM MENTIONED, WE -- A BUNCH OF

17    THE EMPLOYEES WERE MOVED OVER TO DAPPER LABS, ALL OF THE

18    TECHNOLOGY REGARDING TO THE BLOCKCHAIN WORK AND THE

19    CRYPTOKITTIES' WORK WAS MOVED OVER TO DAPPER LABS.

20              THE COURT:  THANK YOU, SIR.

21              SO JUMPING AHEAD, JUST BASED ON WHAT HE JUST SAID, WHAT

22    GENERAL COUNSEL JUST SAID, IN YOUR VIEW, WE DON'T HAVE THE

23    RIGHT ENTITY HERE.

24              MR. GERSHENSON:  THAT'S ABSOLUTELY TRUE, YOUR HONOR.

25              THE COURT:  EVEN IF THE COURT WERE TO ENTERTAIN THIS,

1      WHICH YOU'VE HEARD I HAVE SOME VERY SERIOUS CONCERNS ABOUT, BUT

2      IF I WERE TO ENTERTAIN IT, I DON'T HAVE THE RIGHT ENTITY HERE.

3           MR. GERSHENSON:  CORRECT.  EVEN IF YOU WERE TO

4      ENTERTAIN IT, AND WE'VE NOT FOUND ANY NINTH CIRCUIT CASE WHERE

5      AN INJUNCTION GOES AGAINST A PARENT AND SOMEHOW ISN'T WORST

6      AGAINST EITHER A SUB OR SOME COMPANY --

7           THE COURT:  THEY'RE MAD AT YOU BECAUSE THEY SAID YOU

8      WERE THE ONES WHO BREACHED THEIR NON-DISCLOSURE.

9           MR. GERSHENSON:  SO A FEW FACTS ON THAT; NUMBER ONE, WE

10     DIDN'T BREACH THE NON-DISCLOSURE.  IF YOU LOOK AT IT, IT SAYS

11     THERE'S CONFIDENTIAL INFORMATION.  IT CAN'T BE USED FOR

12     ANYTHING OTHER THAN THE DEFINED SUBJECT MATTER, AND THEN THE

13     SUBJECT MATTER IS DEFINED AS AXIOM ZEN, WHO THEY'RE NOW SAYING

14     IS USING INFORMATION.

15          NUMBER TWO, THIS PI WAS BROUGHT STRICTLY ON THE TRADE

16     SECRET CLAIM.  THERE IS NOTHING BEFORE YOU ON THE CONTRACT

17     CLAIM, YOUR HONOR, IN TERMS --

18          THE COURT:  THAT'S TRUE, TOO.  YOU HEARD MY QUESTIONS

19     TO PLAINTIFF.  IT WAS MY UNDERSTANDING, BASED ON WHAT I HAVE,

20     THAT THE TRADE SECRET WAS IN THIS DOCUMENT, AND THAT THE TRADE

21     SECRET CAME FORWARD, AND THEN THIS LAST PAGE WAS SENT

22     SUBSEQUENTLY TO AXIOM.

23          MR. GERSHENSON:  CORRECT, YOUR HONOR.

24          THE COURT:  WHAT DID YOU THINK -- I KNOW YOU DON'T

25     THINK THERE WAS A TRADE SECRET, BUT ASSUMING THERE IS, WHAT IS

1    IT THAT YOU UNDERSTAND -- HAVE I MISUNDERSTOOD ALL OF THIS?

2        MR. GERSHENSON:  FRANKLY, I ASKED THE VERY SAME

3    QUESTION TO OPPOSING COUNSEL, "AT THIS POINT WHAT IS YOUR TRADE

4    SECRET?" AND I DON'T KNOW.  IT'S DEFINITELY NOT IN THAT

5    DOCUMENT THOUGH.  THAT DOCUMENT NEVER MENTIONS DIGITAL

6    COLLECTIBLES.

7        THE COURT:  DOES COMMODITIZATION MEAN SOMETHING THAT I

8    DON'T KNOW?

9        MR. GERSHENSON:  OUR UNDERSTANDING OF THE PLAIN READING

10   OF THAT DOCUMENT, WHICH THE DECLARATION SHOWS WAS CONFUSING,

11   WAS SIMPLY THINGS LIKE IT SAID YOU COULD INVEST IN THE

12   ENTERTAINER, AND YOU MAKE MONEY OFF THE POPULARITY, OF THE RISE

13   AND FALL OF THAT ENTERTAINER.

14       I'M LOOKING AT THEIR PAGE 55 IT'S LABELED.  I ACTUALLY

15   HAVE A HAND-UP, IF I MAY APPROACH.

16       THE COURT:  CERTAINLY.

17       MR. GERSHENSON:  THANK YOU, YOUR HONOR.  WE NEVER SAW

18   ANYTHING HERE ABOUT DIGITAL COLLECTIBLES.

19       THE COURT:  BUT DOES SOMEHOW COMMODITIZATION AND THE

20   TOKEN CONCEPT MEAN -- BECAUSE NOW I'M HEARING A MUCH BROADER

21   CONCEPT FROM WHAT I UNDERSTOOD FROM THE SLIDE DECK.

22       MR. GERSHENSON:  IT DIDN'T MEAN THAT TO ANYONE AT AXIOM

23   ZEN.  IT DOESN'T MEAN THAT TO THE THREE PEOPLE WHO LOOKED AT IT

24   AND SAID IT WAS CONFUSING AND A DEAD END, AND NEVER DISCUSSED

25   IT AGAIN, AND NEVER TOOK ANY ACTION ON IT, AND NEVER USED IT,

1    PER THE DECLARATIONS OF MS. REBAK, AND LEAO AND COPE.

2          IT DOES SAY -- WHEN I THINK OF COMMODITIZATION, IF

3    WE'RE LOOKING AT PAGE 55, IT SAYS, "THE PEOPLE -- LET'S SEE,

4    "IN RETURN -- MEANING THE LAST SENTENCE, "IN RETURN THEY, THEY,

5    I GUESS, MADE SOME PROFIT FROM THEIR SUCCESS."  AND AS FAR AS I

6    CAN TELL COMMODITIZATION IS, I GUESS, I BUY A COIN FOR BRITNEY

7    SPEARS.  WHEN SHE GETS HER VEGAS GIG, IT GOES UP IN VALUE.  IF

8    SHE HAS A NERVOUS BREAKDOWN, IT GOES DOWN IN VALUE.

9          THE COURT:  IF STEPH CURRY'S TEAM WINS THE

10   CHAMPIONSHIP, THEN STEPH CURRY'S COIN GOES UP.  WELL, MAYBE

11   THAT'S A BAD EXAMPLE.  YEAH, IF THE ENTERTAINER DOES WELL, MY

12   COINS ARE WORTH MORE.  AND THROUGH THEIR MARKETPLACE I COULD

13   TRADE, SELL, SOMEHOW NEGOTIATE THEM, IF I WANTED TO.

14         MR. GERSHENSON:  CORRECT.  AND BY CONTRAST, THERE WAS

15   AN ARTICLE WHERE MACK FLAVELLE, THE CREATOR OF CRYPTOKITTY,

16   SAID "NOT CRYPTOCURRENCY, CRYPTOKITTIES.  THEY'RE TOTALLY

17   DIFFERENT."  AND SO FOR OURS THE VALUE COMES FROM ATTRIBUTES OR

18   CATTRIBUTES, AS THEY'RE CALLED, AND BREEDING, AND FINDING

19   RARITIES.  IT HAS NOTHING TO DO WITH MR. CURRY'S CAREER ONE WAY

20   OR THE OTHER OR MS. SPEARS FOR THAT MATTER.

21         THE COURT:  SO IF YOU HAD -- THIS ISN'T TERRIBLY

22   RELEVANT, BUT IF YOU HAD CRYPTOKITTIES, YOUR CRYPTOKITTIES

23   COULD HAVE CRYPTOKITTIES?

24         MR. GERSHENSON:  A HUNDRED PERCENT, YOUR HONOR.

25         THE COURT:  THEY COULD, AND THE ATTRIBUTES THAT THEY

```
1      GET IS DETERMINED BY SOME POTENTIALLY TRADE SECRET PROGRAM THAT

2      YOU HAVE THAT DOES THAT.

3           MR. GERSHENSON:  AN ALGORITHM OF 256-BIT OF --

4           THE COURT:  LET ME ASK YOU THIS, COUNSEL, WAS THERE

5      MORE YOU WANTED TO SAY OR SHOULD WE MOVE ON?

6           MR. GERSHENSON:  I'M HAPPY TO ADDRESS YOUR QUESTIONS.

7           THE COURT:  LET ME JUST ASK YOU A COUPLE MORE

8      QUESTIONS, AND THEN I'M GOING TO SAVE ENOUGH TIME FOR PEOPLE TO

9      RESPOND.

10          MR. GERSHENSON:  YES.

11          THE COURT:  ASSUMING FOR THE MOMENT THAT PLAINTIFF HAS

12     A PROTECTABLE TRADE SECRET AND THAT YOU MISAPPROPRIATE IN SOME

13     FORM -- MISAPPROPRIATED IT IN SOME WAY, HAVE YOU HARMED

14     PLAINTIFF BY GIVING THE SECRET TO DAPPER AND DAPPER HAVING

15     PUBLICLY RELEASED IT?

16          MR. GERSHENSON:  SO OBVIOUSLY WE DON'T AGREE WITH THE

17     ORIGINAL PREMISE.

18          THE COURT:  I UNDERSTAND THAT.

19          MR. GERSHENSON:  TO BE CLEAR, NO, THERE'S NO

20     IRREPARABLE HARM.  THIS IS A COMPANY THAT IS NOT IN BUSINESS.

21     I THINK THE LINDEBOOM CASE THAT WE CITED IS PRETTY USEFUL.

22     THERE IT WAS ABOUT AN EDITING STUDIO THAT DIDN'T HAVE A STUDIO

23     UP SO THERE WAS NO CHANCE OF LOSING GOODWILL.  HERE WE CALLED

24     THEM OUT SPECIFICALLY IN THE OPPOSITION AND WE SAID, "WHERE ARE

25     THE INVESTORS YOU'VE LOST?  WHERE ARE THE CUSTOMERS?  WHERE ARE
```

31

1    THE CELEBRITIES?"  WE GOT THEIR REPLY, THERE WAS NOTHING.

2    THERE WAS NO EVIDENCE.

3         THIS IS AN EVIDENTIARY ISSUE ON A PRELIMINARY

4    INJUNCTION.  THEY HAVE A HIGH BURDEN TO MEET.  THEY DIDN'T COME

5    CLOSE.  THEY THREW IN ONE COMMENT FROM ONE INVESTOR WHO SAID,

6    "OTHER INVESTORS WEREN'T INTERESTED BECAUSE OF THIS."  THEY

7    SAID THAT INVESTORS EXPLICITLY SAID THEY WENT TO US INSTEAD OF

8    THEM BECAUSE OF THIS GREAT IDEA.  WE'VE SEEN ZERO EVIDENCE OF

9    THAT, NOT AN EMAIL, NOT EVEN AN INTERNAL EMAIL SAYING, "WE LOST

10   SO AND SO BECAUSE WE GAVE OUR IDEA AWAY."  NOTHING TO THAT.  SO

11   THAT'S NUMBER ONE.

12        THEY'RE NOT REALLY IN BUSINESS.  WE COULDN'T FIND THEM

13   AS A CALIFORNIA CORPORATION, SO WHO IS THE GOODWILL EVEN GOING

14   TO?  SO NO PARTNERS.  NO GOODWILL.  NOT IN BUSINESS.  EVEN IF

15   THEY WERE IN BUSINESS, THEY'RE IN A DIFFERENT BUSINESS.

16        SO THE *LUCAS FILM ENTERTAINMENT* CASE IS ON POINT THERE.

17   THERE WAS A QUESTION ABOUT A LITTLE KID'S EDUCATION GAME ON ONE

18   HAND AS OPPOSED TO A 12 AND OVER VIDEO GAME ON THE OTHER.  AND

19   THE COURT SAID, "NO, THERE'S NO IRREPARABLE HARM HERE.  YOU'RE

20   NOT COMPETING," AND THAT'S THE SAME.  THEY WANT CELEBRITY

21   CRYPTOCURRENCY.  WE HAVE COLLECTIBLES.  NEVER THE TWAIN SHALL

22   MEET.  SO THERE WAS NO IRREPARABLE HARM, YOUR HONOR.

23        THE COURT:  YOU'RE CONTENDING THAT IRREPARABLE HARM IS

24   SPECULATIVE AND THE PARTIES OPERATE IN DIFFERENT SEGMENTS OF

25   THE MARKET.

1          MR. GERSHENSON:  CORRECT, YOUR HONOR.

2          THE COURT:  AND YOU CITE ME TO COPYRIGHT, TRADEMARK,

3     PATENT CASES FOR THAT PROPOSITION.  SHOULD I EXTEND THAT

4     REASONING TO THE TRADE SECRET AREA?

5          MR. GERSHENSON:  I THINK SO, YOUR HONOR.  IF ANYTHING

6     THE COPYRIGHT AREA IS HARDER FOR US BECAUSE IRREPARABLE HARM IS

7     IS PRESUMED UNLESS THEY'RE NOT COMPETING.  THERE'S NO SUCH

8     PRESUMPTION THAT WE HAVE TO OVERCOME IN THE TRADE SECRET SPACE.

9     SO THAT'S THE ANSWER TO THAT QUESTION, YOUR HONOR.

10          THE COURT:  DIDN'T THE HARM ACTUALIZE ONCE THE SECRET'S

11    DISCLOSED?

12          MR. GERSHENSON:  SO LET'S TAKE A LOOK AT THAT.

13          THE COURT:  REGARDLESS OF WHAT INDUSTRY.

14          MR. GERSHENSON:  UNDERSTOOD, YOUR HONOR.  SO LET'S TALK

15    ABOUT THE DISCLOSURE.  SO IF WE COULD LOOK AT TAB A, PLEASE,

16    AND LET'S LOOK AT SOME OF THE PUBLIC EXAMPLES WHERE THE

17    PURPORTED TRADE SECRET WAS DISCLOSED PRIOR TO ANY OF THIS.

18          THE VERY FIRST DOCUMENT THERE, THE EXHIBIT 12, IS FROM

19    JANUARY 10TH, 2018, "TOKENIZING THE ECONOMY, SPORTS INDUSTRY."

20    THIS IS DEAD ON TO WHAT THEY CLAIM THEY SENT US.  THAT GOES ON

21    TO TALK ABOUT THE BLOCKCHAIN TECHNOLOGY.  IT STARTS TALKING AT

22    THE BOTTOM THERE ABOUT CERTAIN INDIVIDUALS, AND IT GOES ON TO

23    TALK ABOUT SPECIFIC ATHLETES.  SO IN TERMS OF DISCLOSURE, THIS

24    WAS ALL DISCLOSED BEFORE STARCOIN EVER CAME ON THE SCENE.

25          IF YOU CONTINUE FLIPPING AHEAD, WE HAVE THE TOKEN STARS

1       WEB PAGE RIGHT IN THE MIDDLE THERE.  THIS IS BASED ON AN AUGUST

2       2017 WHITE PAPER, "TOKENIZED CELEBRITIES, ATHLETES, ACTORS,

3       ROCK BANDS, ANYONE."  SO IF THE DISCLOSURE OCCURRED, IT

4       OCCURRED WELL BEFORE ANY OF THIS.

5               ON THE NEXT PAGE IN THAT SAME TAB YOU'VE GOT A COMPANY

6       USING STARCOIN TV.  THEY EVEN HAVE THE SAME EXACT NAME.  I

7       SHOULD SAY, WHEN WE TALKED ABOUT THE TWO DIFFERENT BUSINESSES,

8       WHAT'S THE BUSINESS?  COINS.  THEY DO COINS.  THEY DO $5 BILLS.

9       WE DO PIECES OF ART.  IT'S JUST A MEDIUM, CURRENCY AND

10      COLLECTIBLES.

11              AND THEN FINALLY -- NOT FINALLY BUT NEXT TO FINALLY,

12      PENULTIMATELY, EXHIBIT 23, IT SAYS, "EMAIL WE TALKED ABOUT FOR

13      CRYPTOCELEBRITIES."  THIS IS AGAIN -- THE FINAL EMAIL IS MAY,

14      BUT THE CHAIN STARTS IN JANUARY OF 2018, AND IT'S ALL ABOUT

15      THIS OTHER CRYPTO ENTITY DISCLOSING THE USE OF CELEBRITIES.

16              FINALLY, THE LAST DOCUMENT IN TAB A, UNDER THE SUBJECT

17      OF DISCLOSURE, WE GOT THIS WEBSITE FROM MR. FEINBLATT'S

18      LINKED-IN PROFILE.  IT WAS MENTIONED SO WE WENT TO LOOK AT IT.

19      I MEAN, HERE IT IS THE PURPORTED TRADE SECRET, OR AT LEAST SOME

20      GREAT CHUNK OF IT, HE HAS PUT --

21              THE COURT:  WHERE ARE YOU, COUNSEL?

22              MR. GERSHENSON:  I APOLOGIZE, YOUR HONOR, LAST EXHIBIT

23      IN TAB A, AND IT'S TRADE STAR.

24              THE COURT:  OKAY.  THANK YOU.

25              MR. GERSHENSON:  LOOK, THIS MAY BE JUST A MOCK-UP THAT

34

```
 1      HE'S PUT THERE, BUT IT'S PRETTY DARN CLOSE TO WHAT HE CLAIMS IS
 2      HIS TRADE SECRET AND YET THERE IT IS AGAIN ON THE INTERNET FOR
 3      ALL TO SEE.  SO THERE'S NO HARM FROM OUR ALLEGED DISCLOSURE.
 4      WE NEVER EVEN USED THEIR IDEA OR ANYTHING LIKE IT.
 5            FRANKLY, EVEN IF THERE WERE HARM FROM THAT, EVEN IF
 6      THIS WERE A TRADE SECRET, WE DID IT ALL FIRST, AND THAT'S WHAT
 7      TAB B IS VERY CLEAR ON.  IT'S APPENDIX A.  IT'S THE
 8      CRYPTOKITTIES' TIMELINE.  IT STARTS IN OCTOBER, ALTHOUGH THE
 9      DECLARATION FROM MACK FLAVELLE INDICATES THEY ALREADY HAD THE
10      IDEA TO BE WITH CELEBRITIES IN AUGUST OR SEPTEMBER OF 2017.
11      AND THEN THERE IN AUGUST WE'RE REACHING OUT TO CHARMAINE
12      CROOKS, OLYMPIC ATHLETE.  THEN THERE'S THE ARTICLE THAT YOUR
13      HONOR MENTIONED IN HER TENTATIVE RULING WHERE WE SAY WE'RE THE
14      FLAG BEARER FOR ASSOCIATING CELEBRITIES WITH CRYPTOKITTIES.  AS
15      WE LOOKED AT THE TIMELINE, WE'VE GOT IN THAT SAME PERIOD MACK
16      FLAVELLE PUBLICLY TWEETING -- AND THIS WAS ALL STUFF THEY COULD
17      HAVE FOUND BEFORE SUING US FRANKLY.  AND IT'S TWEETING
18      CELEBRITIES ABOUT CREATING KITTIES IN THEIR LIKENESS, WHICH YOU
19      WOULD HAVE TO LICENSE.  WE LAUNCH OUR PRODUCT.  AND THEN IN
20      DECEMBER, THREE MONTHS BEFORE WE HEAR ANYTHING, THE LA
21      CLIPPERS.  THAT'S THE NBA.  THE NBA THAT STEPH CURRY COMES
22      FROM.  YOU SAID IT'S A SURPRISING COINCIDENCE.  WELL, WE'RE IN
23      VANCOUVER, RIGHT?  STEPH CURRY IS IN THE BAY AREA.  HE'S THE
24      MOST POPULAR, MOST TELEGENIC ATHLETE IN THAT AREA.  I DON'T
25      THINK IT'S SUCH A COINCIDENCE THAT WE WOULD USE HIM.
```

```
 1      MEANWHILE, THE DOCUMENT THEY SENT US ALSO HAS THE ROCK, AND

 2      JUSTIN BIEBER, AND ANYONE ELSE.  SO IT REALLY IS -- COINCIDENCE

 3      IS A FAIR WORD, BUT AS YOU SEE RIGHT HERE IN JANUARY WE WERE

 4      HAVING THE DISCUSSIONS SEEKING THAT VERY SAME PARTNERSHIP.  SO

 5      IT'S ONLY AT THE VERY END OF THIS THAT STARCOIN COMES ON THE

 6      SCENE, SENDS US A POWERPOINT.

 7           NOW, WE CAN COMPARE AND CONTRAST THAT, SO WE'RE TALKING

 8      ABOUT HARM, AND THE BALANCE OF HARMS, AND WHO WAS THE FIRST TO

 9      MARKET, IF WE FLIP, PLEASE, YOUR HONOR, TO TAB C, AND THAT

10      SHOULD HAVE THEIR POWERPOINT THAT YOU POINTED --

11           THE COURT:  THE SLIDE DECK.

12           MR. GERSHENSON:  CORRECT.  LET'S LOOK AT THEIR ROADMAP

13      AND COMPARE AND CONTRAST WHO IS FIRST TO MARKET.  IT SAYS --

14      EXHIBIT 9, PAGE 61, IT SAYS IN THE LOWER RIGHT-HAND CORNER,

15      "ROADMAP."

16           THE COURT:  I'M GETTING THERE.

17           MR. GERSHENSON:  TAKE YOUR TIME.  UNDERSTOOD.

18           THE COURT:  OKAY, I'M ON 61.

19           MR. GERSHENSON:  THERE'S THE ROADMAP, AND THERE YOU

20      HAVE JANUARY 2018 THEY GET THEIR SEED GRANT.  THIS IS MONTHS

21      AFTER WE'VE ALREADY LAUNCHED OUR PRODUCT.  THEN THEY SAY, IN

22      FEBRUARY OF 2018, THEY'RE GOING TO BEGIN ON BOARDING THE FIRST

23      TEN ENTERTAINERS.  NOW, WE HAVE NO IDEA IF ANY OF THAT

24      HAPPENED, WHERE THEY STAND.  BUT YOU TALK ABOUT FIRST TO

25      MARKET, THEY'RE TALKING JUNE 2018, THAT'S TODAY, THAT THEY'RE
```

1    GOING TO PERFORM BETA TESTS AND LAUNCH PREP.  THEY CAN'T BE

2    FIRST TO MARKET AND THERE CAN'T BE HARM.  I HOPE THAT ANSWERS

3    YOUR QUESTION.

4         THE COURT:  IT DOES, COUNSEL.  THANK YOU.  WE DON'T

5    HAVE A LOT OF TIME LEFT, BUT I KNOW THIS IS IMPORTANT TO BOTH

6    SIDES, SO I'M CERTAINLY WILLING TO GIVE --

7         ALEX, WE'RE STILL EXPECTING THEM AT 2:30?

8    (DISCUSSION HELD OFF THE RECORD.)

9         THE COURT:  I'M STILL EXPECTING MY 2:30, BUT

10   FORTUITOUSLY FOR BOTH SIDES, MY CLERK TELLS ME IT'S LIKELY TO

11   BE A CONTINUANCE, SO I KNOW PEOPLE WOULD LIKE MORE TIME.  LET

12   ME ASK YOU THIS, WOULD YOU LIKE ME TO TAKE A SHORT FIVE,

13   10-MINUTE BREAK AND THEN I'LL COME BACK?  I'LL GIVE EACH

14   SIDE -- SINCE THE NEXT MATTER IS GOING TO BE A CONTINUANCE --

15   15 MINUTES EACH TO TELL ME WHATEVER YOU WOULD LIKE TO TELL ME,

16   THEN I'LL TAKE THIS MATTER UNDER SUBMISSION.

17        THE ONE QUESTION I'LL HAVE FOR EACH SIDE IS DOES THE

18   ORDER GO UNDER SEAL OR CAN THE ORDER BE PUT OUT THERE?  I THINK

19   THE ORDER NEEDS TO BE PUT OUT THERE BECAUSE THERE HAS BEEN --

20   THERE HAVE BEEN THINGS OUT THERE THAT SAY I ALREADY ISSUED THIS

21   ORDER, WHICH IS KIND OF DISHEARTENING TO THE COURT.  I DON'T

22   KNOW HOW THAT CAME TO PASS, BUT IT DID, SO I THINK WHATEVER

23   HAPPENS NEEDS TO BE OUT THERE.

24        MR. GERSHENSON:  WE AGREE, YOUR HONOR.  IF THE RECESS

25   AND THAT PLAN WORKS FOR YOU, WE'RE HAPPY TO DO WHATEVER WORKS

1       FOR THE COURT.

2               THE COURT:  I'LL GIVE YOU 15 MINUTES, AND I'LL GIVE

3       THEM 15 MINUTES.

4               MR. LOBBIN:  THAT'S AGREEABLE, YOUR HONOR, THANK YOU.

5               THE COURT:  THANK YOU.

6               MR. GERSHENSON:  THANK YOU.

7       (COURT WAS AT RECESS.)

8               THE CLERK:  RECALLING NUMBER ONE ON THE CALENDAR,

9       18-CV-972, FOUNDER STARCOIN VS. LAUNCH LABS.

10              OKAY, MR. RICHARDSON, COME BACK TO THE PODIUM, SIR.

11      I'M GOING TO TRY TO DO MY VERY BEST NOT TO INTERRUPT YOU OR

12      PEPPER YOU WITH QUESTIONS.  YOU'VE HEARD MY QUESTIONS TO BOTH

13      SIDES, AND AGAIN PERSUADE ME OTHERWISE, SIR.

14              MR. RICHARDSON:  SURE.  THANK YOU, YOUR HONOR.

15              THE COURT:  YOU'RE WELCOME.

16              MR. RICHARDSON:  AGAIN, FEEL FREE IF YOU HAVE ANYMORE

17      QUESTIONS TO ASK, EITHER WAY IS FINE OBVIOUSLY.

18              SO TO ADDRESS SOME OF THE POINTS THAT WERE BROUGHT UP

19      DURING DEFENDANT'S RESPONSE -- WELL, ACTUALLY, FIRST, I WANT TO

20      DIRECT YOU TO EXHIBIT A, OUR EXHIBIT A, THE EMAIL CHAIN BETWEEN

21      MR. FEINBLATT AND MS. REBAK.

22              THE COURT:  I DON'T HAVE ALL THE EXHIBITS UP HERE.  I

23      JUST HAVE SOME OF THE EXHIBITS.  JUST GO AHEAD, SIR.

24              MR. RICHARDSON:  OKAY.  SO I'M SPECIFICALLY REFERRING

25      TO AN EMAIL CHAIN, AS I SAID, BETWEEN MR. FEINBLATT AND MS.

1      REBAK DATED FEBRUARY 9TH, 2018, AND THIS IS AFTER THE MNDA WAS

2      SIGNED AND AFTER THE ORIGINAL SLIDE DECK WAS SENT.

3              THE COURT:  OKAY.

4              MR. RICHARDSON:  SO MR. FEINBLATT SAYS TO MS. REBAK,

5      "WE WOULD LIKE TO COLLABORATE WITH AXIOM ZEN ON IDEATION AND

6      DEVELOPMENT.  WE ARE THINKING OF STARTING WITH RELEASING

7      DIGITAL CONTENT FROM ENTERTAINERS FIRST AND THEN CREATING THE

8      OWNERSHIP AND SPECULATIVE TOKEN ASPECT LATER."  SO THIS TIES

9      INTO WHAT I WAS SAYING ORIGINALLY IN THAT AT THIS POINT IN

10     FEBRUARY STARCOIN HAD PUT THE SPECULATIVE TOKEN ASPECT TO THE

11     SIDE AND WAS MORE FOCUSED ON THE DIGITAL COLLECTIBLES THAT IT

12     IS STILL FOCUSED ON.

13             THE COURT:  I WANT YOU TO READ THIS AGAIN.  SLOW DOWN.

14             MR. RICHARDSON:  "WE WOULD LIKE TO COLLABORATE WITH

15     AXIOM ZEN ON IDEATION AND DEVELOPMENT.  WE ARE THINKING OF

16     STARTING WITH RELEASING DIGITAL CONTENT FROM ENTERTAINERS

17     FIRST, THEN CREATING THE OWNERSHIP AND SPECULATIVE TOKEN ASPECT

18     LATER."  HE THEN GOES ON TO SAY, "WE CURRENTLY HAVE AND ARE

19     FORMING MANY EXCITING PARTNERSHIPS TO ACCELERATE GROWTH

20     REGARDING ON BOARDING ENTERTAINERS."

21             THE COURT:  AND THE DATE OF THIS IS THEN FEBRUARY THE

22     9TH, 2018?

23             MR. RICHARDSON:  YES, YOUR HONOR.

24             THE COURT:  THANK YOU.

25             MR. RICHARDSON:  YES.  AND THEN TO ADDRESS THE -- ALSO

1        THE POINT OF THE SLIDE DECK NOT CONTAINING DIGITAL COLLECTIBLE

2    ITEMS, IF I CAN DIRECT YOUR ATTENTION TO AGAIN THE "EXCHANGES"

3    PAGE -- OR THE "BUSINESS MODEL" PAGE RATHER UNDER "EXCHANGE,"

4    IT SAYS, "WE TAKE A TRANSACTION FEE FROM TRADING TOKENS AND

5    DIGITAL CONTENT ON OUR EXCHANGE," SO IT'S DIGITAL CONTENT --

6    THERE'S ONLY TWO TYPES OF ETHEREUM BLOCKCHAIN ITEMS, THERE'S

7    FUNGIBLE CONTENT, WHICH IS THE ACTUAL CURRENCY, AND THERE'S

8    NON-FUNGIBLE, WHICH IS THE DIGITAL CONTENT.  SO WE DO

9    SPECIFICALLY ADDRESS IN THE SLIDE DECK THE DIGITAL CONTENT

10   RELATED TO ENTERTAINERS ASPECT.

11        AND THEN ALSO, AND THIS IS IN THE SLIDE DECK, AS WELL

12   AS THE EMAIL CHAIN, THE MOCK-UP OF THE USER INTERFACE THAT'S

13   BACK IN THE EMAILS IN EXHIBIT A, WITH THE STEPH CURRY PICTURE,

14   IT SAYS UNDER "STEPH CURRY TRADING CARD" AND THEN GIVES IT A

15   DOLLAR AMOUNT.  SO IT WAS VERY CLEAR TO MS. REBAK -- IT SHOULD

16   HAVE BEEN VERY CLEAR TO MS. REBAK, IN HER DISCUSSIONS WITH MR.

17   FEINBLATT, THAT STARCOIN WAS TALKING ABOUT DEVELOPING DIGITAL

18   CONTENT.  THAT'S WHAT OUR BUSINESS MODEL WAS FOCUSING ON.

19   THAT'S WHAT WE TALKED TO AXIOM ZEN ABOUT, AND THAT'S WHAT WE'RE

20   FOCUSING ON IN THIS CASE.  WE'RE NOT CONCERNED WITH THE DIGITAL

21   CURRENCY ASPECT.

22        MOVING ON FROM THERE, AGAIN I WANT TO TOUCH BRIEFLY ON

23   THE DAPPER LABS/AXIOM ZEN ISSUE JUST TO TIE THAT UP.  WE STILL

24   CONTEND THAT WE NEVER HAD ANY INTERACTIONS WITH DAPPER LABS.

25        THE COURT:  I WASN'T EVER SUGGESTING THAT YOU DID.  I

```
 1    WAS JUST SUGGESTING THAT THEY'RE NOT HERE AND THAT THEY'RE THE

 2    ONES WHO HAVE CRYPTOKITTIES, AND DID THE STEPH CURRY, AND

 3    PULLED THAT BACK AND EVERYTHING.  I WASN'T SAYING THAT YOU EVER

 4    HAD ANYTHING.  AND AXIOM SIGNED YOUR DISCLOSURE AGREEMENT, I

 5    UNDERSTAND.

 6          MR. RICHARDSON:  RIGHT.  AND THAT'S ONE OF THE MAIN

 7    ISSUES HERE, ALONG WITH THE TRADE SECRET MISAPPROPRIATION

 8    ISSUE, IS THE CONFIDENTIAL INFORMATION -- THE BREACH OF THE

 9    MNDA BY DISCLOSING --

10          THE COURT:  THAT'S NOT BEFORE THE COURT TODAY.

11          MR. RICHARDSON:  IT IS WHAT'S BEFORE US TODAY.  THEY'RE

12    VERY RELATED ISSUES, WHEREAS, IF THIS COURT ULTIMATELY

13    DETERMINES THAT IT'S NOT A TRADE SECRET, IT CAN STILL BE

14    CONFIDENTIAL, PROPRIETARY INFORMATION BECAUSE IT WASN'T

15    PUBLICLY KNOWN.  AND IF IT WAS DISCLOSED IN VIOLATION OF THE

16    MNDA, IT'S STILL A BREACH OF THE MNDA AND AXIOM SHOULD BE

17    ENJOINED FROM FURTHER DISCLOSURE AND SHOULD HAVE TO RETURN OR

18    DESTROY THE INFORMATION THAT WAS GIVEN TO THEM.

19          I ALSO WOULD LIKE TO TOUCH ON THE -- ONE OF THE

20    ARGUMENTS RAISED BY AXIOM ZEN IN ITS PAPERS IS THAT THEY WERE

21    BASICALLY JUST ENTERTAINING MR. FEINBLATT, "BEING POLITE" WAS

22    THE WORD THAT THEY USED.  WE DON'T REALLY UNDERSTAND THAT

23    ARGUMENT OF BEING POLITE BECAUSE IF THEY WERE JUST BEING

24    POLITE, WHY DID THEY CEASE BEING POLITE ONCE THEY RECEIVED THE

25    STARCOIN INFORMATION AND GO COMPLETELY DARK ON MR. FEINBLATT?
```

1          WHY DID AXIOM ZEN INSIST ON USING ITS OWN MNDA RATHER THAN JUST

2      SIGNING STARCOIN'S?  WHY WOULD A COMPANY WITH AS MUCH SUCCESS

3      AND MARKET TRACTION AS AXIOM CLAIMED TO HAVE --

4              THE COURT REPORTER:  SLOW DOWN.

5              MR. RICHARDSON:  -- A POTENTIAL COMPETITOR JUST TO BE

6      POLITE?  PERHAPS MOST IMPORTANTLY, WHY DIDN'T AXIOM RESPOND TO

7      MR. FEINBLATT BY SIMPLY SAYING, "WE ALREADY HAVE THIS

8      INFORMATION.  THIS IS NOT CONFIDENTIAL.  WE WERE WORKING ON THE

9      SAME IDEA.  WE HAVE BEEN."  THEY SAY THAT THEY WERE.  THEY

10     POINT TO TWEETS FROM AN EMPLOYEE, MACK FLAVELLE, THAT THEY DID

11     REACH OUT TO ENTERTAINERS, BUT I DON'T THINK A TWEET -- A

12     COUPLE TWEETS AMOUNT TO A FULL-ON BUSINESS PLAN, BUSINESS AND

13     MARKETING PLAN.

14             I THINK, SURE, PERHAPS -- OBVIOUSLY THEY ADDRESSED IT

15     IN PASSING OR THEY THREW IT AROUND A LITTLE BIT, BUT THEY DID

16     NOT GO INTO THE SAME DEPTH OF CREATING AN ENTIRE BUSINESS

17     CENTER AROUND THAT.  THEIR BUSINESS WAS CRYPTOKITTIES, AND THIS

18     CURRYKITTY WAS A SIDE PROJECT THAT WE THINK THEY GOT THE IDEA

19     FROM US.

20             SO IN CLOSING, I WOULD JUST LIKE TO REITERATE WHAT

21     WE'RE ASKING FOR IN TERMS OF THE INJUNCTION.

22             THE COURT:  SURE.

23             MR. RICHARDSON:  FIRST, WE WOULD ASK THAT AXIOM BE

24     ENJOINED FROM FURTHER MISAPPROPRIATION OR USE OF STARCOIN'S

25     TRADE SECRETS AND/OR CONFIDENTIAL BUSINESS INFORMATION IF THIS

1    COURT DETERMINES THERE ARE TRADE SECRETS.

2         THE COURT:  SEE, WHAT WE COME BACK TO IS I STILL DON'T

3    UNDERSTAND WHAT YOUR TRADE SECRET IS.  KEEP GOING.

4         MR. RICHARDSON:  ALL RIGHT.  AND THEN WITHIN SEVEN DAYS

5    -- EXCUSE ME, WITHIN SEVEN DAYS OF THE ORDER, AXIOM SHOULD

6    RETURN ALL DOCUMENTS AND OTHER MATERIALS RECEIVED FROM STARCOIN

7    PURSUANT TO THE MNDA, RETURN OR DESTROY, AND GIVE CONFIRMATION

8    OF THE DESTRUCTION IF THAT'S THE CASE.

9         THE COURT:  DO YOU THINK -- WHEN WE'RE FINISHED THIS

10   AFTERNOON, I'M GOING TO TAKE THIS MATTER UNDER SUBMISSION.  I'M

11   GOING TO GO BACK THROUGH EVERYTHING THAT I HAVE AND CONSIDER

12   ALL OF THE ARGUMENTS BECAUSE I WOULDN'T HAVE WASTED MY TIME,

13   YOUR TIME, OPPOSING COUNSEL'S TIME, IF I WEREN'T WILLING TO

14   CONSIDER IT.

15        MY ORDER CAN BE A PUBLIC ORDER, CAN'T IT, COUNSEL?

16        MR. RICHARDSON:  I THINK SO, YES, IT CAN BE A PUBLIC

17   ORDER.

18        THE COURT:  OKAY.  AND WE SHOULD NOTE NOBODY HAS BEEN

19   IN HERE THIS AFTERNOON EXCEPT THOSE OF US THAT HAVE BEEN PRIVY

20   TO THIS HEARING.  THANK YOU.

21        MR. RICHARDSON:  BEFORE I STEP DOWN AND GIVE THE PODIUM

22   TO THE DEFENDANT, IS THERE ANY OTHER COMMENT OR QUESTIONS ABOUT

23   ME SIMPLY TALKING -- YOU DON'T THINK THAT THERE'S A TRADE

24   SECRET --

25        THE COURT:  I SAID I DON'T KNOW WHAT YOU THINK YOUR

1      TRADE SECRET IS.  IS YOUR TRADE SECRET DIGITIZED CELEBRITY

2      COLLECTIBLES?

3          MR. RICHARDSON:  YES, PRECISELY, YES.

4          THE COURT:  IF THAT'S WHAT IT IS, SHOW ME WHERE IT IS

5      BECAUSE IT'S NOT HERE.  I LOOKED IT UP ON THE BREAK, AND

6      COMMODITIZATION OF AN ENTERTAINER DOES NOT MEAN WHAT YOU'RE

7      SAYING IT MEANS, COUNSEL, AND -- EVERYBODY IN THIS ROOM IS AS

8      SMART AS THE OTHER PERSON IN THIS ROOM, AND THAT'S NOT WHAT IT

9      IS, SIR, AND I'M SAYING THAT WITH ALL KINDNESS AND RESPECT,

10     SIR, BUT I DON'T SEE IT.  SO HELP ME BECAUSE THAT'S NOT WHAT

11     THIS SAYS.

12         TO ME -- WHAT I UNDERSTOOD THIS TO BE, AND I READ THIS

13     MANY TIMES, AND READ THE PAPERS, IF I WANTED TO INVEST IN AN

14     ENTERTAINER -- PICK ONE, I DON'T KNOW -- I COULD GO TO A

15     MARKETPLACE AND I COULD BUY SOMETHING THAT REPRESENTED SHARES,

16     IF YOU WILL, TOKENS, I DON'T CARE WHAT YOU CALL THEM, AND IF

17     THAT STAR DID GREAT, I'D GET SOME BENEFIT.  MAYBE I COULD

18     NEGOTIATE WITH THOSE WITH OTHER PEOPLE WHO MIGHT WANT TO BUY

19     THEM, AND I MIGHT MAKE SOME MONEY, AND I KNOW YOU WOULD TAKE --

20     THE WAY I UNDERSTAND IT, YOUR COMPANY THAT YOU REPRESENT WOULD

21     TAKE A PERCENTAGE, AND THE CELEBRITY WINS, AND I WOULD WIN, AND

22     EVERYBODY WOULD WIN, BUT THAT'S WHAT IT WAS THE WAY I

23     UNDERSTOOD IT, AND THAT'S WHAT I GOT FROM THE PAPERWORK, SO I

24     DIDN'T SEE THE COLLECTIBLE CELEBRITY IN THE DIGITIZED FORM.

25         MR. RICHARDSON:  WELL, THAT'S PART OF THE SLIDE DECK.

1      ADMITTEDLY, THAT'S PART OF THE SLIDE DECK.  HOWEVER, AND I

2      TOUCH ON THIS A BIT, IF YOU LOOK AT PAGE 6 OF THE SLIDE DECK

3      UNDER "BUSINESS MODEL" AND THEN "EXCHANGE" IT SAYS, "WE TAKE --

4           THE COURT:  LET ME GET TO PAGE 6.

5           MR. RICHARDSON:  UNDER "EXCHANGE" ON THE RIGHT-HAND

6      SIDE, IT SAYS, "WE TAKE A TRANSACTION FEE FROM TRADING TOKENS

7      AND DIGITAL CONTENT ON OUR EXCHANGE.  INDIVIDUALS, ENTERTAINERS

8      AND BUSINESSES CAN ACTIVELY TRADE OR HAVE THE PLATFORM DO THE

9      TRADING FOR YOU," SO WE DO TALK ABOUT DIGITAL CONTENT IN THE

10     SLIDE DECK.

11          AND THEN ALSO IN THE EMAILS, LIKE I SAID, THE DIGITAL

12     CONTENT FOR ENTERTAINERS WAS DISCUSSED WITH MS. REBAK, AND THEN

13     ALSO THE MOCK-UP OF THE USER INTERFACE, WHICH IS IN THE SLIDE

14     DECK AND IN THE EMAILS, WITH THE AFOREMENTIONED STEPHAN CURRY

15     TRADING CARD MOCK-UP.

16          THE COURT:  THANK YOU.  IT WAS VERY HELPFUL.  I

17     APPRECIATE IT.

18          MR. RICHARDSON:  THANK YOU, YOUR HONOR.

19          THE COURT:  SO, COUNSEL, I TRY NOT TO ASK QUESTIONS,

20     BUT NOW I'M GOING TO ASK A QUESTION, AND THEN YOU CAN GO OFF

21     AND TELL ME ANYTHING YOU WANT TO TELL ME.  COUNSEL TELLS ME THE

22     REFERENCE TO DIGITAL CONTENT -- TRADING TOKENS AND DIGITAL

23     CONTENT IS SUFFICIENT TO TELL SOMEBODY, YOU OR ME, I GUESS,

24     THAT THAT MEANS A COLLECTIBLE IN THE SAME CONCEPT THAT YOU DO.

25     COMMENT ON THAT.

```
 1              MR. GERSHENSON:  IT DIDN'T TELL ANYONE WHO RECEIVED IT

 2       THAT THEY WERE TALKING ABOUT COLLECTIBLES.  IT DIDN'T TELL ME.

 3       I DON'T BELIEVE IT WOULD TELL THE REASONABLE OBSERVER.  DIGITAL

 4       CONTENT TO ME COULD BE, FRANKLY, ANYTHING.  I DON'T SEE DIGITAL

 5       COLLECTIBLES HERE ANYWHERE.  IN THEIR PAPERS THEY START TO SAY

 6       IT'S THEIR ENTIRE BUSINESS.  IF IT WAS THEIR ENTIRE BUSINESS,

 7       IT WOULD HAVE BEEN IN THE POWERPOINT.  IT WOULD HAVE BEEN IN

 8       THE SLIDES, AND THEY WOULD KNOW HOW TO SPELL IT.  THEY SPELL IT

 9       DIFFERENT WAYS, WITHIN THE BRIEF TWO DIFFERENT WAYS, WITHIN THE

10       DECLARATION TWO DIFFERENT WAYS.  JUST FOR BRANDING PURPOSES, IF

11       THAT'S YOUR BUSINESS, YOU'RE GOING TO SETTLE ON A WAY TO SPELL

12       THE WORD COLLECTIBLES, SO I'M NOT SEEING IT THEN OR NOW, YOUR

13       HONOR.

14              THE COURT:  GO AHEAD AND TELL ME WHATEVER YOU WANT TO

15       TELL ME, SIR.

16              MR. GERSHENSON:  SURE.  MAY I APPROACH BRIEFLY?

17              THE COURT:  OF COURSE.

18              MR. GERSHENSON:  SO THIS IS JUST FOR THE RECORD,

19       BECAUSE COUNSEL KEEPS SAYING WE NEED TO DESTROY OR RETURN THE

20       MATERIALS, AND I JUST WANT TO BE PERFECTLY CLEAR.  WE TOUCHED

21       BASE LAST NIGHT BECAUSE -- JUST TO BUTTON UP EVERYTHING SO THAT

22       THERE WAS NO CONCERN ABOUT ANY OF THIS INFORMATION, NONE OF

23       WHICH WE BELIEVE TO BE CONFIDENTIAL OR TRADE SECRET OR ANYTHING

24       OF THE LIKE.  NONETHELESS, TO BUTTON EVERYTHING UP, WE HIRED A

25       FORENSIC VENDOR, THEY WENT IN, THEY QUARANTINED THE MATERIALS.
```

1    THEY PRESERVED IT IN CASE THIS LITIGATION GOES FORWARD, WHICH

2    WE CLEARLY HOPE IT DOES NOT, AND WE WILL FILED A MOTION TO

3    DISMISS TO THAT EFFECT, AND THEY DELETED THE MATERIALS.

4         I'M SURPRISED TO HEAR THEM KEEP SAYING "WITHIN

5    SEVEN DAYS THEY NEED TO DELETE THE MATERIAL.  THEY NEED TO GET

6    RID OF THE MATERIAL."  HERE IT IS.  AS I SAID, AND WE WILL TELL

7    THE COURT TOMORROW, THE MATERIALS ARE DONE.  THERE IS NO SUCH

8    THING AS YOUR POWERPOINT WITH OUR CUSTODIANS ANYMORE, SO I JUST

9    WANT TO GET THAT OFF THE TABLE, YOUR HONOR, PLEASE.

10        THE COURT:  OKAY.

11        MR. GERSHENSON:  IN ADDITION, I WILL DEFINITELY NOT

12   TAKE THE 15 MINUTES, BUT ON THE BALANCE OF HARMS, I WANT TO

13   TOUCH ON THAT A LITTLE BIT.  YOU MENTIONED THE ARTICLE THAT'S

14   OUT THERE.  I MEAN, WE ARE TRYING, AS WE SPEAK, TO CONTINUE THE

15   PARTNERSHIPS THAT WE'VE BEEN BUILDING FOR MONTHS WITH THE NBA,

16   AND ALL OTHER SPORTS LEAGUES, AND ENTERTAINERS.  THIS IS A BIT

17   OF -- I DON'T WANT TO USE THE WORD CLOUD, BUT IT'S A PROBLEM

18   HANGING OVER US.  WE ARE TRYING TO MOVE FORWARD --

19        THE COURT:  THE WORD IS OUT THAT THIS COURT ISSUED THE

20   ORDER.

21        MR. GERSHENSON:  HIGHLY UNFORTUNATE, YOUR HONOR.

22   CLEARLY HAD NOTHING TO DO WITH US.

23        THE COURT:  I CAN'T IMAGINE THAT ANYONE HERE WOULD HAVE

24   DONE THAT, BUT IT'S UNFORTUNATE.  NO, I KNOW YOU WOULDN'T.

25        MR. RICHARDSON:  THIS IS THE FIRST WE'VE HEARD OF IT,

1    YOUR HONOR.

2            MR. GERSHENSON:  WE SAW IT AND WERE QUITE TAKEN ABACK.

3            THE COURT:  THE REASON THE COURT SAW IT IS IT'S BEEN

4    REPORTED ON LAW 360 AND ALL THE SERVICES THAT THE COURT GETS.

5    IT'S BEEN REPORTED ALL OVER THE PLACE IN LEGAL CIRCLES, AND I

6    SAID, "HOW COULD THIS BE?"  SO THAT'S WHY IT CAME TO MY

7    ATTENTION.  I DIDN'T DO ANY RESEARCH, I JUST WANTED YOU TO KNOW

8    IT'S BEEN REPORTED.

9            MR. GERSHENSON:  THE ARTICLE DID QUOTE MR. FEINBLATT,

10    NOT SAYING THAT YOU HAD ISSUED THE ORDER, BUT HE HAD SENT

11    MATERIALS WAS THE FIRST SOURCE WE SAW.  SO THAT WAS

12    DISCONCERTING THAT IT WOULD NEED CLARIFIED THAT THERE HAD BEEN

13    NO ORDER FROM THE COURT.

14            WE'RE ALSO DOING THE SERIES B.  WE NEED A LEAD

15    INVESTOR.  TALK ABOUT BALANCE OF HARMS TO A LIVE COMPANY WHO IS

16    DOING GOOD BUSINESS AND INNOVATIVE THINGS EVERY DAY, THIS HAS

17    BEEN A REAL PROBLEM, AND OBVIOUSLY AN INJUNCTION WOULD UNDULY

18    HARM US.

19            QUICKLY, WE MENTIONED BEFORE THE CONTRACT CLAIMS NOT AT

20    PLAY HERE, WAS NOT IN THEIR PAPERS.  IN ANY EVENT, THERE IS NO

21    BREACH OF THIS CONTRACT.  WE DIDN'T USE THEIR INFORMATION.  WE

22    DIDN'T DISCLOSE WHATEVER THEIR PURPORTED TRADE SECRET MAY BE.

23    THE MOTION TO DISMISS ADDRESSES THAT AS WELL.

24            AND THEN THEY KEEP SAYING, "WHY DIDN'T YOU RESPOND TO

25    US AND TELL US THAT YOU HAD THIS IDEA?"  WE DIDN'T HAVE TO

1       BECAUSE IT WAS PUBLIC.  WE HAD THE TWEETS.  WE HAD THE ARTICLE.

2       THIS IS WHAT WE DO.  AND WE SAID, "WE'RE THE FLAG BEARERS," SO

3       THERE'S NOTHING UNTOWARD ABOUT NOT TELLING A TOTAL STRANGER,

4       WHO KIND OF WAS HARASSING, AND SENDING EMAIL AFTER EMAIL, "CAN

5       YOU CALL ME?  CAN YOU CALL ME?"  WE JUST SAID, "WE DON'T WANT

6       TO DO BUSINESS WITH YOU.  WE'LL TALK TO YOU IN JUNE.  LEAVE US

7       ALONE."  THERE'S NOTHING UNTOWARD ABOUT DOING THAT.  THAT'S HOW

8       BUSINESS IS DONE.

9            WHEN YOU PRESENT AN UNAPPEALING, INCOHERENT POWERPOINT,

10      YOU'RE PROBABLY NOT GOING TO GET A LOT OF REACTION BACK, AND

11      THAT'S WHAT HAPPENED HERE.

12           WE DEFINITELY AGREE, YOUR HONOR, THAT THE ORDER SHOULD

13      AND IN FACT NEEDS TO BE OPENED.  THANK YOU.

14           THE COURT:  THANK YOU.  INTERESTING.  THE ISSUE'S

15      INTERESTING, AND THE TECHNOLOGY IS INTERESTING.  I LEARNED A

16      LOT ABOUT WHAT'S GOING ON OUT THERE.  I WASN'T FAMILIAR WITH

17      CRYPTOKITTIES, TO BE HONEST.  I DON'T KNOW WHO ALL THE PEOPLE

18      ARE WHO ARE DOING ALL OF THIS, BUT IT WAS FASCINATING.

19           I'M GOING TO GO BACK THROUGH EVERYTHING BECAUSE I KNOW

20      THESE LEGAL ISSUES ARE CRITICAL TO YOUR CLIENTS AND TO YOUR

21      CLIENTS.  I'LL GO BACK THROUGH EVERYTHING.  YOU'LL GET A

22      REASONED ORDER.  I WILL PUT IT UP ON THE PUBLIC SIDE OF THINGS.

23      IT WON'T BE UNDER SEAL.

24           DOES THIS TRANSCRIPT NEED TO STAY UNDER SEAL?

25           MR. GERSHENSON:  FROM OUR PERSPECTIVE, NO, YOUR HONOR.

```
1              MR. LOBBIN:  WE SHARE THAT SENTIMENT.  WE DON'T THINK

2         IT NEEDS TO BE UNDER SEAL.

3              THE COURT:  ALTHOUGH NOBODY HAS BEEN IN HERE THIS

4         AFTERNOON LISTENING TO US -- I KNOW YOU WERE CONCERNED ABOUT

5         THAT AT THE OUTSET -- THE TRANSCRIPT IS OPEN AND IS NOT UNDER

6         SEAL, SO I APPRECIATE THAT.

7              SO THANK YOU, AND YOU'LL HEAR FROM THE COURT IN DUE

8         COURSE.

9              MR. LOBBIN:  THANK YOU, YOUR HONOR.

10             MR. GERSHENSON:  THANK YOU, YOUR HONOR.

11        (COURT WAS AT RECESS.)

12

13

14

15

16

17                    C E R T I F I C A T E

18

19             I, GAYLE WAKEFIELD, CERTIFY THAT I AM A DULY
          QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED
20        STATES DISTRICT COURT, THAT THE FOREGOING IS A TRUE AND
          ACCURATE TRANSCRIPT OF THE PROCEEDINGS AS TAKEN BY ME IN THE
21        ABOVE-ENTITLED MATTER ON JUNE 14, 2018; AND THAT THE FORMAT
          USED COMPLIES WITH THE RULES AND REQUIREMENTS OF THE UNITED
22        STATES JUDICIAL CONFERENCE.

23

24        DATED:  JUNE 28, 2018        /S/ GAYLE WAKEFIELD
                                       GAYLE WAKEFIELD, RPR, CRR
25                                     OFFICIAL COURT REPORTER
```