UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOUNDER STARCOIN, INC., a California Corporation,<br><br>                                        Plaintiff,<br><br>v.<br><br>LAUNCH LABS, INC., a Canada Corporation doing business as Axiom Zen,<br><br>                                        Defendant. | Case No.: 18-CV-972 JLS (MDD)<br><br>**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**<br><br>(ECF No. 5) |

Presently before the Court is Plaintiff Founder Starcoin, Inc's Motion for Preliminary Injunction, ("MTN," ECF No. 5).[1]  Also before the Court are Defendant Launch Labs, Inc.'s Opposition to, ("Opp'n," ECF No. 21),[2] and Plaintiff's Reply in Support of, (ECF No. 25), the Motion.  The Court heard oral argument on June 14, 2018.

---

[1] The Court granted Plaintiff's Motion to Seal, (ECF No. 8), and pin citations to Plaintiff's moving papers are to the sealed document located at ECF No. 9-1.  At oral argument, the parties agreed a public order is appropriate in this case.  Accordingly, the Court redacts the portions of each party's filings that they requested be sealed.

[2] The Court granted Defendant's Motion to Seal, (ECF No. 23), and pin citations to Defendant's Opposition brief are to the sealed document located at ECF No. 24.

Having considered the parties arguments, the evidence, and the law, the Court rules as follows.

## BACKGROUND

Plaintiff Founder Starcoin is a San Diego, California-based company that focuses its business in the "cryptocollectibles" market. ("Compl.," ECF No. 1, ¶¶ 1, 6.) Cryptocollectibles are unique, digital assets created using blockchain technology.[3] (*Id.*) Defendant Launch Labs, doing business as Axiom Zen, is a Canada corporation that also conducts business in the cryptocollectible market. (*Id.* ¶¶ 2, 8.) In August 2017, Defendant began developing "CryptoKitties, a game built on the Ethereum blockchain that allows users to securely buy, sell, trade, and breed genetically unique virtual cats." (Opp'n 8 (citing Declaration of Jody Rebak ("Rebak Decl."), ECF No. 21-2, ¶ 4).)[4] In the months after the initial development, Defendant pursued the idea of associating with celebrities and sports stars to develop "Kitties" with the celebrities' likeness. (*Id.* at 9 (citing Rebak Decl. ¶ 5).)

Along those lines, on October 20, 2017, Axiom publicly disclosed its plan to match celebrities to CryptoKitties. Defendant's product manager was quoted in a Vice.com news article as saying:

> "Kitties should be a part of this revolution of bringing blockchain technology to the masses . . . So many great companies are

---

[3] Plaintiff provides a definition of blockchain technology, which the Court finds useful in understanding the underlying technology:

> Blockchain technology consists of a publicly-distributed ledger that records transactions between multiple parties by containing a cryptographic hash of the previous transaction, a timestamp, and transaction data. These transactions are distributed and recorded across multiple computers, ensuring that there are multiple copies to prevent altering a transaction record. This allows the ledger to be easily verifiable despite being decentralized.

(MTN 5 n.1 (citing *The Great Chain of Being Sure About Things*, The Economist, https://www.economist.com/briefing/2015/10/31/the-great-chain-of-being-sure-about-things, (Oct. 31, 2015)).)

[4] Pin citations to docketed material refer to the CM/ECF page numbers electronically stamped at the top of each page.

> building awesome technology that the world won't care about or understand. We're the flag bearer for the rest of this ecosystem in terms of getting celebrities to associate with kitties and the Ethereum network."

(Rebak Decl. ¶ 7 (quoting Ex. 7, ECF No. 22-5, at 3).) Between October 2017 and February 2018, Defendant began discussions with a few celebrities to license their likeness on CryptoKitties.[5] (*See* Opp'n 10.)

On November 28, 2017, Defendant launched CryptoKitties and within a month approximately 180,000 individuals signed up for the game and brought in $20 million in revenue to Defendant. (*Id.* at 11 (citing Declaration of Mack Flavelle, ("Flavelle Decl."), ECF No. 21-4, ¶¶ 6, 8).) Between November 2017 and January 2018, various investors, including CAA Ventures, Digital Currency Group, Mark Pincus, and Andreessen Horowitz, contacted Defendant regarding investment opportunities in Axiom. (*Id.* (citing Rebak Decl. ¶ 9).) Those investors ultimately decided to fund Axiom; specifically, Andressen Horowitz and Digital Currency Group committed on January 18, 2018 and February 7, 2018, respectively. Mark Pincus verbally committed in January 2018 and signed with Defendant in March 2018. (*Id.* (citing Rebak Decl. ¶ 9).) On February 2, 2018, Axiom spun off the CryptoKitties game into a new company, Dapper Labs, Inc. (*Id.* at 12 (citing Rebak Decl. ¶ 10).) Dapper Labs received the rights to CryptoKitties and twenty employees from Axiom. (*Id.* (citing Rebak Decl. ¶¶ 12–13).) Axiom received a majority holding in Dapper Labs. (*Id.*)

Previously, on January 3, 2018, Tyler Breton, the Chief Executive Officer ("CEO") and co-founder of third-party Makemoji, contacted Axiom's Chief Operating Officer ("COO") Mack Flavelle about the possibility of celebrity partnerships. (Flavelle Decl. ¶ 12; Ex. 21, ECF No. 21-10, at 2.) Mr. Flavelle met with Mr. Breton and one of Mr.

---

[5] For example, a representative of the NBA team the Los Angeles Clippers reached out to Mr. Flavelle via LinkedIn. (Opp'n 11–12.) Additionally, Mr. Flavelle publicly tweeted at the rappers Ghostface Killer, Young Thug, and Lil B, as well as the singer Poppy. (*Id.* at 10.) There is no indication in the record that any of these artists responded.

Breton's colleagues, Mr. Ray Lee, on February 7, 2018 to discuss celebrity partnerships and Mr. Breton followed up by email on February 13, 2018. (Flavelle Decl. ¶ 12; Ex. 6, ECF No. 21-7, at 2.) Mr. Lee likewise emailed on February 13, 2018 to discuss his celebrity contacts. (Flavelle Decl. ¶ 12; Ex. 22, ECF No. 21-11, at 2.) By phone, Mr. Lee introduced Mr. Flavelle to Oliver Camilo, CEO of third-party Appmoji. (Flavelle Decl. ¶ 12.) It was Mr. Flavelle's understanding that NBA star Stephen Curry was an investor in Appmoji and that Appmoji had rights to Mr. Curry's likeness. (*Id.*) Sometime thereafter, Dapper Labs began negotiating with Appmoji concerning a CryptoKitty featuring Mr. Curry's likeness. (*Id.*)

On February 8, 2018, Plaintiff's CEO Jevon Feinblatt emailed an employee at Axiom in search of a business partnership with Axiom and stated that Plaintiff was "developing a unique solution for the entertainment industry." (*Id.* (quoting Rebak Decl. ¶ 15); Ex. 8, ECF No. 22-6, at 7.) Jody Rebak, Axiom's Chief of Staff, responded requesting additional information from Mr. Feinblatt. (MTN 7; Ex. 8, at 7.) Mr. Feinblatt then requested a mutual non-disclosure agreement ("MNDA"), which Ms. Rebak sent and Mr. Feinblatt signed on February 9, 2018. (Opp'n 12 (citing Rebak Decl. ¶ 17); MTN 5.) The MNDA defined "Confidential Information" generally as "any nonpublic 'information, technical data or know-how.'" (MTN 8 (quoting Ex. A, ECF No. 1-2, at 2).) The MNDA further prohibited the parties from using any such Confidential Information. (*Id.*) The same day, Mr. Feinblatt sent a slide deck depicting and describing Plaintiff's business model.[6] (Rebak Decl. ¶ 17.) In the email accompanying the slide deck, Mr. Feinblatt stated, "[w]e would like to collaborate with Axiomzen on ideation and development. We are thinking of starting with releasing digital content from entertainers first then creating the ownership and speculative token aspect later." (Ex. A, at 10.)

---

[6] Ms. Rebak states that outside of two individuals she courtesy copied on an email response to Mr. Feinblatt, she did not circulate his slide deck to anyone at Axiom. (Rebak Decl. ¶ 21.) Further, the two employees, Kim Cope and Julia Leao, also state that they did not circulate the slide deck to anyone in the company. (Declaration of Kim Cope, ECF No. 21-3, ¶¶ 6, 8; Declaration of Julia Leao, ECF No. 22-17, ¶ 5.)

Plaintiff's slide deck described its business as a method for celebrities to "commoditize themselves, fund their projects, and create a new type of asset via the first security complaint token platform for entertainers." (Ex. 9, ECF No. 21-8, at 3.) Plaintiff's product was to allow entertainers to "commoditize themselves . . . by launching a regulated token." (*Id.* at 5.) Businesses representing those entertainers could fund their clients through a "token sale" and could also invest in other company's entertainers. (*Id.*) Finally, individuals could invest in their favorite entertainers by purchasing a token and profit from the entertainer's successes. (*Id.*) Plaintiff would create the tokens, host the tokens on its "regulated exchange," and vet entertainers to insure the value rose for investors. (*Id.* at 6.) Plaintiff would generate income by taking a "percentage of capital raised from each token offering" and take a transaction fee for any trading of tokens on Plaintiff's exchange. (*Id.* at 7.) Plaintiff's slide deck disclosed its plan to develop its platform in April 2018 and perform beta tests by June 2018.[7] (*Id.* at 11.)

On February 13, 2018, Mr. Feinblatt followed up via email and sent an additional slide to Ms. Rebak, which depicted a mock-up of Plaintiff's mobile phone-based concept. (Ex. 10, ECF No. 21-9, at 2.) Mr. Feinblatt's email explained, "[t]he slide contains a sample of our current concept, although we have many different models, ideas for content, and the general [user experience] we're currently discussing." (*Id.*) Notably, the additional mock-up contained stock images of Stephen Curry, Dwayne "The Rock" Johnson, and players from the Las Vegas Raiders and LA Kings. (*Id.*) Plaintiff sent follow up emails to

---

[7] Plaintiff's slides also depicted attorneys who apparently constituted Plaintiff's "Regulatory Team." (Ex. C, ECF No. 9-5, at 9.) These attorneys worked for Cooley LLP, who also represents Defendant in this litigation. At oral argument, the Court inquired whether a conflict of interest existed for one firm to represent both sides. (ECF No. 31, at 3.) Defendant answered that the Cooley attorney(s) who interacted with Plaintiff have been walled off from this litigation. (*Id.* at 6.) And, more importantly, Cooley's attorneys never signed an agreement to represent Plaintiff; essentially, Cooley rebuffed Plaintiff's business offer and Cooley did not represent Plaintiff. (*Id.*) Plaintiff's counsel replied that they could not determine what information, if any, had been transmitted from Plaintiff to Cooley, (*id.* at 5) but did not think there was sufficient conflict to raise the issue before the Court, (*id.* at 8.) Based on the information before the Court, it does not appear that there is a conflict of interest, nor does either party make such an argument. Thus, the Court notes that it has considered the issue and finds it does not affect this motion.

its contacts at Axiom and Axiom responded on February 19, 2018 that it was still reviewing Plaintiff's information and slide deck. (MTN 6.) Plaintiff called Defendant on February 26, 2018 to discuss potential collaboration, but Defendant informed Plaintiff via email that Axiom could not discuss the slide deck until "closer to June." (*Id.* at 10 (citing Ex. A).) The parties had no further contact.

On May 7, 2018, Dapper Labs released three "CurryKitties" based on the likeness of NBA star Stephen Curry. (Opp'n 14 (citing Declaration of Caty Tedman, ECF No. 21-1, ¶ 6).) Dapper Labs later pulled the CurryKitties from its website because it discovered that the parties involved in the licensing transaction did not have rights to Mr. Curry's likeness. (*Id.* at 10 n.4.) On May 16, 2018, Plaintiff filed a Complaint, (ECF No. 1), and two days later filed the present Motion for Preliminary Injunction based on trade secret misappropriation, (ECF No. 5).

## LEGAL STANDARD

A preliminary injunction is an equitable remedy aimed at preserving the status quo and at preventing the occurrence of irreparable harm during the course of litigation. *See* Fed. R. Civ. P. 65. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citing, e.g., *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)); *see also Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. This "clear showing" requires the plaintiff to show more than a mere "possibility" of irreparable harm; instead, he must "demonstrate that irreparable injury is likely in the absence of an injunction." *Id.*; *Am. Trucking*, 559 F.3d at 1052. A district court may consider evidence, including hearsay statements, in deciding to whether to issue a preliminary injunction. *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (citing

*Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc); and *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)).

Federal Rule of Civil Procedure 65(d) requires that every order granting an injunction must "state the reasons why it issued; state its terms specifically; and describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." "This mandate for specificity ensures that those against whom an injunction is drawn receive fair and precise notice of what conduct is prohibited." *Halo Mgmt., LLC v. Interland, Inc.*, 308 F. Supp. 2d 1019, 1027 (N.D. Cal. 2003) (citing *Union Pac. R.R. v. Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000)). Rule 65 also requires the movant to give security in an amount that the Court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. Fed. R. Civ. P. 65(c).

## ANALYSIS

## I.  Likelihood of Success on the Merits

Plaintiff brings its trade secret misappropriation claim under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*  (Compl. ¶¶ 25–35.)  18 U.S.C. § 1836(b)(3)(A) permits district courts to enter injunctions to prevent any actual or threatened misappropriation occurring after May 11, 2016, *see* Pub. L. No. 114-153, § 2, 130 Stat. 376, 381–82; *Vendavo, Inc. v. Price f(x) AG*, No. 17-CV-6930-RS, 2018 WL 1456697, at *3 (N.D. Cal. Mar. 23, 2018).  As other district courts in this circuit have recognized, the definitions of trade secret and misappropriation are virtually the same in both the federal DTSA, 18 U.S.C. § 1839, and the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426.1.  *See Waymo LLC v. Uber Techs., Inc.*, No. C 17-939 WHA, 2017 WL 2123560, at *7 (N.D. Cal. May 15, 2017); *Shapiro v. Hasbro, Inc.*, No. CV 16-5750-BRO (AJWx), 2016 WL 9024810, at *7 (C.D. Cal. Aug. 15, 2016).  Accordingly, federal district courts in California have applied California's trade secret case law to causes of action brought under the federal DTSA.  *See Vendavo*, 2018 WL 1456697, at *3 ("The

elements of a trade secret misappropriation claim under the DTSA are substantially similar to those under older state statutes.").

A prima facie claim for misappropriation of trade secrets under the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.*, requires: "(1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff." *Cytodyn, Inc. v. Amerimmune Pharm., Inc.*, 160 Cal. App. 4th 288, 297 (Cal. Ct. App. 2008) (quoting *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1665 (Cal. Ct. App. 2003)).

### A. Whether Plaintiff Owned a Trade Secret

Plaintiff argues that in February 2018 it provided Defendant "valuable, confidential, trade secret information . . . concerning licensing digital collectibles based on athletes, entertainers and celebrities that Axiom did not have, and was not then developing." (MTN 15 (footnote omitted).) Plaintiff further contends that Defendant never stated to Plaintiff that Axiom was developing anything related to digital collectibles for celebrities or athletes. (*Id.* at 16.) Plaintiff concludes that Defendant's lack of statements to Plaintiff concerning development of digital collectibles means that Plaintiff's "business plan development was significantly ahead of Axiom's in these particular areas at issue." (*Id.*)

Defendant responds that Plaintiff's alleged trade secrets are in the public domain and information that is public knowledge cannot be a trade secret. (Opp'n 18 (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984)).) Defendant characterizes Plaintiff's purported trade secret as nothing more than using celebrities to sell products, which has been around since well before 2018. (*Id.*) Defendant also points out that even if Plaintiff had a protectable trade secret then Plaintiff has not overcome the fact that Defendant, not Plaintiff, developed its products first. Defendant asserts that by February 2018, it had both an existing product and well-advanced, public plans to associate that product with celebrities and athletes. (*Id.* at 21–22.) According to Defendant, Plaintiff only had a high-level general concept and no specific product. (*Id.*)

Next, Defendant distinguishes Plaintiff's purported trade secret from Defendant's actual product. According to Defendant, Plaintiff's slide deck reveals that its trade secret was to use a blockchain-based and mobile-based asset to invest in a celebrity. (*Id.*) Defendant points out that this idea is well-known in the "crypto-space." (*Id.*) Moreover, Axiom's model is entirely different because celebrities license with Axiom to create a web-based collectible that users can buy, sell, and trade. (*Id.*)

Plaintiff responds that Defendant mischaracterizes Plaintiff's trade secrets and business model. (Reply 2.) Plaintiff argues that it is not claiming a secret in "tokenizing" celebrities or working with them to advertise a digital product. (*Id.* at 3.) Instead, Plaintiff's trade secret, licensing the likeness of a celebrity for a digital collectible, was not known or used in the blockchain industry. (*Id.*) Plaintiff points out that what is generally well-known in one industry can be a trade secret in a different industry. (*Id.* (citing *Beacon Wireless Solutions, Inc. v. Garmin Int'l, Inc.*, 894 F. Supp. 2d 727, 731 (W.D. Va. 2012)).) Plaintiff argues that Defendant "essentially admits" that licensing the likeness of a celebrity for a digital collectible was not known in the particular industry because Defendant touted the CurryKitty as "the world's first officially licensed sports crypotcollectible." (*Id.*)

At oral argument, Plaintiff advanced a new argument and pointed to Mr. Feinblatt's email, accompanying the slide deck, stating "[w]e are thinking of starting with releasing digital content from entertainers first then creating the ownership and speculative token aspect later." (Ex. A, at 10.) And, the slide deck states "[t]okens provide ownership and access to exclusive digital and real world content." (Ex. C, at 6.) The slide deck also discloses, "[w]e take a transaction fee from trading tokens and digital content on our exchange." (*Id.* at 7.) Plaintiff argues that, taken together, these references to "digital content" encompasses digital collectibles. ("Transcript," ECF No. 31, at 39–40.) Defendant responded at oral argument that the term "digital content" is so broad that it could encompass anything. (*Id.* at 46.)

/ / /

/ / /

The DTSA defines "trade secret" as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3); *see* Cal. Civ. Code § 3426.1(d). A plaintiff seeking relief for misappropriation of trade secrets "must identify the trade secrets and carry the burden of showing that they exist." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993) (citing *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 250–52 (1968)). Generally, the plaintiff must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012) (quoting *Diodes*, 260 Cal. App. 2d at 253); *see Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir. 1998) (citing *Universal Analytics v. MacNeal–Schwendler Corp.*, 707 F. Supp. 1170, 1177 (C.D. Cal. 1989)).

Here, Plaintiff's purported trade secret suffers from a lack of "sufficient particularity" that might separate it from matters of general knowledge. It is difficult to pin down what exactly constitutes Plaintiff's trade secret. The slide deck takes one position. In the slide deck, Plaintiff purports to claim a method for celebrities to "commoditize themselves, fund their projects, and create a new type of asset via the first security compliant token platform for entertainers." (Ex. 9, at 3.) Plaintiff's product would

allow entertainers to "commoditize themselves . . . by launching a regulated token." (*Id.* at 5.) Alternatively, in its moving papers and at oral argument, Plaintiff characterizes its trade secret as "licensing digital collectibles based on athletes, entertainers and celebrities." (MTN 15; Reply 3.) Is the trade secret a licensing scheme for digital collectibles or is it a method to commoditize and invest in celebrities? The Court need not determine which definition controls because, as will be seen, neither argument prevails.

Assuming for the sake of argument that Plaintiff's trade secret is celebrity licensing of digital collectibles, then as Defendant points out, the Supreme Court has cited with approval the general proposition that "[i]nformation that is public knowledge or that is generally known in an industry cannot be a trade secret." *Ruckelshaus*, 467 U.S. at 1002 (citation omitted); *accord Self Directed Placement Corp. v. Control Data Corp.*, 908 F.2d 462, 465–66 (9th Cir. 1990); *see also* 18 U.S.C. § 1839(3)(B) ("[T]he information derives independent economic value . . . from not being generally known to . . . another person who can obtain economic value from the disclosure or use of the information."). Licensing a celebrity's likeness to promote products sales is a well-known business concept. *See, e.g.*, *Boldface Licensing %8F Branding v. By Lee Tillett, Inc.*, 940 F. Supp. 2d 1178, 1181 (C.D. Cal. 2013) (discussing trademarks involving cosmetics line affiliated with "the celebrity Kardashian sisters—Kourtney, Kim, and Khloe"); *see also Morgan v. Apple Inc.*, No. 17-cv-5277-RS, 2018 WL 2234537, at *1–2 (N.D. Cal. May 16, 2018) (discussing "wireless Bluetooth headphones co-created by athlete LeBron James" and commercials featuring LeBron James using the headphones). Thus, celebrity licensing cannot, by itself, be a trade secret.

Plaintiff, however, is adamant that its trade secret is not simply licensing celebrities. (Reply 3.) Rather, the trade secret is "licensing the likeness of a celebrity for a digital collectible." (*Id.*) Plaintiff contends that "[n]owhere does Axiom Zen disclose working with celebrities to create personalized and licensed digital content." (*Id.* at 4 (emphasis omitted).) The same is true, however, of Plaintiff. Nowhere in the slide deck that Mr. Feinblatt sent to Axiom does Plaintiff disclose that it sought to work with celebrities to

license a digital collectible.  Nor does the follow up email sent by Mr. Feinblatt and containing the stock image of Mr. Curry contain any explicit reference to working with celebrities to license their likeness.  Mr. Feinblatt's email states "[t]he slide contains a sample of our current concept, although we have many different models, ideas for content, and the general [user experience] we're currently discussing."  (Ex. 10, at 2.)  This statement belies a broad range of potential concepts, not a hard and fast trade secret that Defendant could appropriate.  Plaintiff's purported trade secret lacks sufficient particularity that might allow Defendant to ascertain the boundaries of the trade secret.  *See Pellerin*, 877 F. Supp. 2d at 988.

Plaintiff also argues that what is generally known in one industry can be a trade secret when applied to a new industry.  (Reply 3 (citing *Beacon Wireless Solutions*, 894 F. Supp. 2d at 731).)  Even if the Court were to arrive at a similar conclusion, Plaintiff does not take the next step to explain how its business concept or trade secret meets the very proposition Plaintiff proposes.  Instead, Plaintiff points to a statement made by Defendant when it released the "Currykitty" disclosing that the Currykitty was "the world's first officially licensed sports cryptocollectible."  (*Id.*)  Simply because Defendant claimed it was the first to monetize or use the concept does not make it also true that such an idea was a trade secret.  Marrying the concept of celebrity licensing with blockchain technology appears, on its face, to be unremarkable, obvious, and general knowledge.  Nearly every industry attempts to gain celebrity endorsements for products.  While the Court does not discount that there could be a trade secret embedded in this general idea, the Court finds that Plaintiff has not carried its burden to explain how its trade secret is unique to the blockchain industry.

But, the larger issue is this.  Plaintiff's slide deck and follow up email do not support its legal position that Plaintiff's trade secret is licensing celebrities in the digital collectible industry.  The information sent to Defendant does not readily disclose Plaintiff's business model or trade secret.  Instead, the slides disclose a way to commoditize celebrities, by investing and monetizing entertainers' careers, through a token offering.  For example,

18-CV-972 JLS (MDD)

Plaintiff's business model states, "X amount of tokens are allocated to Starcoin. The rest are released to the public to purchase during the token launch and a portion of tokens are allocated to the entertainers, and organizations." (Ex. C, ECF No. 9-5, at 7.) The next slides discloses, "[a] majority of the [Initial Coin Offering] market is unregulated. Our platform launches security compliant tokens to raise capital and invest in additional entertainers when they couldn't before." (*Id.* at 8.) A plain reading of Plaintiff's slide deck is that it intended to create a platform for token offerings in celebrities, not licensing digital collectibles.

The Court accepts the implicit idea that Plaintiff would likely need to sign a license with a celebrity to execute its business model. Yet, such a recognition does not overcome the observation that nowhere in the slide deck or follow up email does Plaintiff disclose that it was pursuing a "collectible" in the same sense that Defendant's product is a unique "collectible." The natural reading of Plaintiff's trade secret is that it hoped to use a fungible asset, cryptocurrency, to commoditize unique celebrities. Defendant's product is a unique collectible (each CryptoKitty is unique) and celebrity's likeness would help sell the unique asset. These two ideas are not equivalent. At bottom, Plaintiff's legal position simply does not support the information sent to Defendant.

If Plaintiff's purported trade secret is the concept actually described in the slide deck sent to Defendant, then it too is generally known in the blockchain industry. As previously stated, the slide deck purports to solve the problem of commoditizing entertainers through token offerings. (Ex. 9, at 3, 5.) Defendant points the Court to several publications or online posts expressing that exact same idea as Plaintiff, i.e., offering an investment opportunity in celebrities and athletes through an initial coin offering or a token offering. (Opp'n 16 (citing Exs. 11–14).) A November 2017 article published on Business Insider.com is particularly noteworthy. It discusses how artists can raise money through token launches and states: "Tokens are the native crypto-assets of a blockchain app. They are powered by smart contracts (code-based financial agreements) that are programmed into Ethereum. When an artist tokenizes, they're turning their intellectual property (IP)

into a financial asset, so an artist's token reflects the value of their creative output." (Ex. 14, at 2.) It is difficult to imagine a more on-point public disclosure of Plaintiff's slide deck and business model. Because Plaintiff's idea is publicly known, it cannot be a trade secret.

At oral argument, Plaintiff pointed to references by Mr. Feinblatt to "digital content" in his email and in the slide deck encompass digital collectibles. (*See* Transcript 39–40.) The Court finds this argument unpersuasive. Digital content could encompass virtually anything produced or created with reference to a digital, as opposed to analog, environment. That broad phrase could not have put Defendant on notice that it claimed a secret in the same digital collectible as Defendant's.

In sum, Plaintiff has the burden of establishing it had a valid trade secret. *MAI Sys.*, 991 F.2d at 522. Plaintiff characterizes its trade secret as "licensing digital collectibles based on athletes, entertainers and celebrities." (MTN 15; Reply 3.) The evidence does not support such a characterization. Plaintiff's trade secret appears to be commoditizing entertainers through blockchain and cryptocurreny. This idea is not new and is general knowledge. Yet, even if Plaintiff's trade secret is licensing digital collectibles then Plaintiff has not carried its burden to show that such an idea is a trade secret. Celebrity licensing is generally known and Plaintiff has not demonstrated how marrying this idea with the blockchain industry is a secret. The Court finds that Plaintiff has not carried its burden to establish that it had a valid trade secret. It follows that Plaintiff has not established a likelihood of success on the merits concerning the first element of a trade secret misappropriation claim.

### B. Whether Defendant Acquired, Disclosed or Used Plaintiff's Trade Secret

Next, the Court considers whether, assuming Plaintiff could show a likelihood of success in demonstrating a trade secret, Defendant acquired, disclosed, or used that trade secret. Plaintiff contends that it is highly likely that Defendant used Plaintiff's confidential information. (MTN 16.) Specifically, Plaintiff argues that Defendant signed the very same athlete, Stephen Curry, as was depicted in a mock-up emailed to Defendant and Defendant

launched a CryptoKitty with Stephen Curry's likeness. (*Id.*) Using the CryptoKitty, Defendant then obtained funding through two venture capital sources that were poised to fund Plaintiff rather than Defendant. (*Id.*) Plaintiff concludes that "[i]t is likely that Axiom did not have these design or business ideas before they were demonstrated to them by Starcoin in February 2018." (*Id.*)

Defendant counters that it independently developed the idea to associate celebrities with CryptoKitties. (Opp'n 22.) To that end, Defendant points out that it publicly pursued plans to associate with athletes and celebrities before Plaintiff reached out to Defendant. (*Id.*) Defendant cites cases where courts have denied preliminary injunctions when evidence existed to support an independent creation of an idea. (*Id.* at 22–23 (citing *Shapiro*, 2016 WL 9176559, at *10; and *Best Lockers, LLC v. Am. Locker Grp., Inc*, No. SACV-12-403, 2012 WL 12845107, at *2 (C.D. Cal. Mar. 30, 2012)).) Defendant would apply similar reasoning here.

Plaintiff responds that the public communications between Defendant and celebrities, as well as the private communications disclosed during this litigation, demonstrate that Defendant did not explicitly discuss licensing the likeness of any celebrity or creating any kind of licensed digital content. (Reply 4.) For example, Defendant reached out to Olympic athlete Charmaine Crooks. Plaintiff points out that Defendant only discusses the idea of fostering a cat, which Plaintiff defines as "simply designing the general look of a Fancy Cryptokitty." (*Id.*) Plaintiff supports its definition of "fostering" by citing two Medium articles, including one written by Mack Flavelle, generally describing fostering—neither article discusses licensing celebrity likenesses. (*Id.* (citing Ex. 20, ECF No. 22-16, at 2; Ex. F, ECF No. 28-2).) Because Defendant does not explicitly reference licensing in its discussions with celebrities, Plaintiff would distinguish the Defendant's evidence demonstrating how Defendant independently arrived at the concept of celebrity licensing.

California's "UTSA does not prevent a person from using independently developed or properly obtained trade secret information already in the possession of another." *Mattel,*

*Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 963 (C.D. Cal. 2011) (citing Cal. Civ. Code § 3426.1(a); and *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265–66 (7th Cir. 1992); and *E.I. Du Pont de Nemours & Co. v. United States*, 288 F.2d 904, 911 (Ct. Cl. 1961)).  Likewise, the federal DTSA defines trade secret as "information deriv[ing] independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3)(B).

The evidence demonstrates that Defendant, not Plaintiff, developed the idea to license digital collectibles using the likeness of celebrities first.  At the outset, the Court notes that Defendant Axiom launched its product in November 2017.  (Flavelle Decl. ¶ 6.)  To date, Plaintiff has not demonstrated it even has a product, much less what constitutes its product.  This would not be fatal had Plaintiff developed its idea before Defendant and, in turn, Defendant relied on Plaintiff's idea.

Yet, as early as October 2017, Defendant was developing the idea to associate celebrities with CryptoKitties.  This was not even a secret because Defendant publicly disclosed its plan on October 20, 2017.  (Rebak Decl. ¶ 7; Ex. 7.)  The same day, Defendant took concrete steps to actualize the plan by corresponding with Olympic athlete Charmaine Crooks.  (Rebak Decl. ¶ 6.)  Defendant continued to reach out to entertainers in late 2017.  (*Id.* ¶ 8; Ex. 4.)  In December 2017, a representative of the L.A. Clippers messaged to Defendant via LinkedIn to begin discussions about a potential agreement.  (Flavelle Decl. ¶ 8; Ex. 5.)  Most importantly, the discussions between Mr. Flavelle and Mr. Breton that ultimately led to Defendant using Mr. Curry's likeness began January 3, 2018—one month before Plaintiff's CEO contacted Defendant.  (Flavelle Decl. ¶ 12; Ex. 21.)  And, Mr. Flavelle followed up on the initial contact on February 6, 2018—two days before Mr. Feinblatt contacted Defendant.[8]  (Flavelle Decl. ¶ 12; Ex. 6.)  The sequence of events

---

[8] Mr. Flavelle states that the meeting in question occurred February 7, 2018.  (Flavelle Decl. ¶ 12.) However, Mr. Breton's email sent 10:27 a.m. on February 7, 2018 references "[g]reat times *last* night."

18-CV-972 JLS (MDD)

directly rebuts Plaintiff's argument that it was "likely that Axiom did not have these design or business ideas before they were demonstrated to them by Starcoin in February 2018." (MTN 16.) The evidence demonstrates that Defendant arrived at the very idea Plaintiff purports to assert well before February 2018.

Plaintiff's arguments to the contrary are unavailing. Plaintiff argues that Defendant's negotiations with celebrities, such as rapper Lil B and athlete Charmaine Crooks, do not explicitly discuss licensing their likenesses. (Reply 4.) This is a true statement. The email chain between Defendant's co-founder and Ms. Crooks does not explicitly discuss licensing. (Ex. 3, at 2–4.) Nor does the solicitation from the Clippers' representative discuss licensing. (Ex. 5, at 2.) It does not follow, however, that a licensing agreement is precluded simply because none of the evidence discloses, explicitly, a licensing agreement. Considering the evidence put forward by Defendant, Axiom arrived at the idea of licensing celebrities for digital collectibles before any disclosures by Plaintiff.

Next, Plaintiff contends that the idea for licensing Mr. Curry's likeness is somehow tainted by the method by which the negotiation between Mr. Flavelle and Appmoji and Makemoji unfolded. (Reply 5.) Plaintiff points out that during the negotiation to license Mr. Curry, Defendant never required Appmoji to perform due diligence or determine whether Appmoji actually had the rights to license Mr. Curry's likeness. (*Id.*) Plaintiff finds it strange that Defendant would not ensure that Appmoji had the rights to Mr. Curry's likeness. (*Id.*) Plaintiff also points out that none of the exhibits concerning Mr. Curry explicitly discuss licensing. (*Id.* at 5–6.) For example, the email sent from Mr. Breton to Mr. Flavelle only mentions coming up with an "actionable plan." (*Id.* at 6 (quoting Ex. 6, at 2).)

There is no doubt that Appmoji's lack of right to use Mr. Curry's likeness casts a shadow on Defendant's business development. Yet, Plaintiff's argument does not speak

---

(Ex. 6 (emphasis added).) It appears the meeting occurred on February 6, 2018 and Mr. Breton followed up by email the next day.

to the precise issue at hand. Did Defendant arrive at the *idea* to license with celebrities, specifically Mr. Curry, before Plaintiff gave Defendant its slide deck? Defects in the end result do not disprove the genesis of the idea occurred before February 9, 2018 (or February 13, 2018 when Plaintiff sent the mock up with Mr. Curry). The fact that Mr. Flavelle began discussing celebrity partnerships with Mr. Breton on January 3, 2018 is persuasive. (*See* Flavelle Decl. ¶ 12; Ex. 21.) That discussion led to a chain of events that resulted in an agreement, though flawed, to license Mr. Curry's likeness.

Plaintiff's second argument—that none of the exhibits explicitly reference a licensing agreement for Mr. Curry—has greater purchase. The communications Defendant points to are vague and do not explicitly reference a licensing agreement. As Plaintiff points out, "[t]hese vague discussions do not amount to solid, well-thought out and novel business plans." (Reply 6.) The same could be said of Plaintiff's own business plan. Nowhere in Plaintiff's materials sent to Defendant does Plaintiff state that it will license celebrities. The reader of Plaintiff's materials must infer that a license agreement will inexorably result from its business concept. If the Court must apply such an inference to Defendant's communications, it does the same to Plaintiff's material. Plaintiff would have the Court ignore the fact the communications between Mr. Flavelle, Mr. Breton, and Mr. Lee actually resulted in a licensing agreement and instead focus on vague discussion leading up to the agreement. The fact that Defendant's employees began discussions that actually resulted in the CryptoCurry overcomes the lack of reference to licensing agreements in either party's communications.

Next, Plaintiff points out that two investors, CAA Ventures and Digital Currency Group, that had previously expressed interest in Plaintiff have now funded Defendant. (*Id.* at 11, 16.) Plaintiff contends that this fact supports its argument that Defendant misappropriated Plaintiff's trade secret. (*Id.* at 16.) Once again, the sequence of events contradicts Plaintiff's interpretation. Defendant states that the two venture capitalists supposedly interested in Plaintiff were already in discussion with Defendant as early as November 2017. (*See* Opp'n 11.) Plaintiff does not address this fact in its Reply brief.

Rather, the facts demonstrate that Defendant independently arrived at its funding before Plaintiff sent its slide deck in February 2018, which undercuts Plaintiff's argument that a misappropriation occurred.

Finally, Plaintiff cites two district court cases where courts granted preliminary injunctions based on misappropriated trade secrets. (MTN 13 (citing *Hunter Consulting, Inc. v. Beas*, No. SACV 12-1947, 2012 WL 6193381, at *3 (C.D. Cal. Dec. 10, 2012); and *Pixon Imaging, Inc. v. Empower Techs. Corp.*, No. 11-CV-1093, 2011 WL 3739529, at *3 (S.D. Cal. Aug. 24, 2011)).) In *Hunter Consulting*, the plaintiff owned proprietary information including "its customer lists pricing information, vendor and collaborator contact information, and proprietary software programs for managing the information." 2012 WL 6193381, at *3. Like here, the plaintiff signed a nondisclosure agreement and the defendants used the proprietary information in breach of the nondisclosure agreement. *Id.* at *4. In *Pixon Imaging*, the plaintiff signed a nondisclosure agreement and disclosed its proprietary software to the defendant in preparation for an acquisition bid. 2011 WL 3739529, at *1. A year after the acquisition fell through, the defendant began using new software that "specifically incorporate[d] proprietary information obtained from" the plaintiff. *Id.* at *2. In both cases, the court enjoined the respective defendant. Plaintiff contends that "Starcoin's likely success on the merits of its trade secret misappropriation claim is as strong (or stronger) than the likely success identified in the analogous *Hunter Consulting* and *Pixon Imaging* cases." (MTN 16–17.)

Both cases are distinguishable and Plaintiff's claim is decidedly weaker than those opinions. In both *Pixon Imagining* and *Hunter Consulting*, the respective plaintiffs had proprietary information they transmitted to the defendants. Here, Plaintiff's purported trade secrets are not defined with the same level of specificity as those cases. *See supra* section I.A. More importantly, the defendant in both cases did not have the proprietary information before the plaintiffs dispatched such information. Axiom has demonstrated

how it arrived at its concept (and publicly disclosed its concept) before Plaintiff ever reached out to Defendant.[9]

In sum, the Court finds that Plaintiff has not established its likelihood of success on the second element for a trade secret misappropriation claim. Because Defendant arrived at its business model independent from and before receiving Plaintiff's slide deck, Defendant could not have appropriated Plaintiff's trade secrets. *See Mattel*, 782 F. Supp. 2d at 963.

### C. Whether Axiom Caused Damage to Starcoin

The Court addresses the third element of a trade secret misappropriation claim. Defendant states it was not Axiom that released the CryptoKitty with Steph Curry's likeness but rather its subsidiary, Dapper Labs. (Opp'n 23.) Moreover, the fact that it was Dapper Labs, not Axiom, behind the release was public knowledge. (*Id.* (citing Exs. 18–19).) Defendant cites the general rule that a parent corporation cannot be "held liable on the basis of its subsidiary's actions." (*Id.* (quoting *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 622 F. Supp. 2d 890, 897 (N.D. Cal. 2009)).) Defendant argues that Plaintiff has presented no evidence to ignore the separate corporate identities and, therefore, no likelihood of success on the merits exists. (*Id.* at 24.)

---

[9] In its Reply brief, Plaintiff attempts to rebut Defendant's argument that it had no intention of working with Plaintiff, but sent several responses to Plaintiff to be "polite." (Reply 6.) Plaintiff contends that Defendant insisted on Plaintiff signing a mutual non-disclosure agreement and suggests that "[i]t strains credulity that Axiom Zen would force its own contract on Starcoin if Axiom Zen truly had no intention of working with Starcoin." (*Id.*)

Plaintiff's argument attempts to rewrite the sequence of events. Mr. Feinblatt emailed Defendant on February 8, 2018. (Ex. A, at 2.) Ms. Rebak responded the same day asking for "additional details about [Starcoin]." (*Id.*) Before sending his company's information, Mr. Feinblatt requested a non-disclosure agreement. (*Id.* at 3.) Ms. Rebak responded requesting to use Defendant's NDA so she would not have engage Axiom's legal team. (*Id.*) After both parties signed the agreement, Mr. Feinblatt sent his company's slide deck. It was only after the NDA was signed that Ms. Rebak would have reason to delay and be polite to Mr. Feinblatt. (*See id.* at 16, 18 (depicting "polite" email responses from Ms. Rebak on February 19, 2018).) That the parties would enter into an NDA *before* transmitting their proprietary information is unremarkable. Plaintiff's argument that the Court should read into Ms. Rebak's responses *after* receiving Plaintiff's information is unpersuasive.

Plaintiff responds that it signed the MNDA with Axiom and sent its confidential information to Axiom, not Dapper Labs. (Reply 6.) It further argues that the misappropriation is not the creation of the Currykitty by Dapper Labs, but the misuse of Plaintiff's trade secrets by Axiom. (*Id.* at 6–7.) Plaintiff concludes by arguing that the misuse of trade secrets can be remedied by a preliminary injunction against Axiom. (*Id.* at 7.)

The Court agrees, to an extent, with Plaintiff. It was Axiom, not Dapper Labs, that received the trade secrets and Axiom that allegedly misappropriated the trade secrets. The Court departs from Plaintiff's reasoning with regard to its conclusion. The issue here is causation. To prevail on a trade secret misappropriation claim, Plaintiff must demonstrate that Defendant's actions damaged Plaintiff. *Cytodyn*, 160 Cal. App. 4th at 297. Was it Axiom that allegedly harmed Plaintiff or was it Dapper Labs? While it may have been Axiom that received Plaintiff's trade secrets, it was Dapper Labs that caused the harm by releasing the CryptoCurry. Indeed, Plaintiff acknowledges that the harm derives from the public disclosure of its trade secret. Plaintiff submitted a declaration stating in pertinent part, "any non-confidential disclosure or publication of one or more of Starcoin's trade secrets could drastically reduce the value of Starcoin's business." (Declaration of Randal Koene, ECF No. 5-7, ¶ 3.) But for the public release of CryptoCurry, there is no exposure of Plaintiff's purported trade secret and no harm to Plaintiff. Dapper Labs released the CryptoCurry (and has the rights to all CryptoKitties) and, thus, Dapper Labs caused the harm to Plaintiff.

In light of the foregoing, the Court finds that Plaintiff has not demonstrated the likelihood of success on the merits for any of the three elements for a misappropriation of trade secret claim.

## II. Irreparable Injury

A preliminary injunction plaintiff must demonstrate that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. "[A]n intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always . . .

show irreparable harm." *Pac. Aerospace & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. 2003) (first alteration in original) (quoting *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92–93 (3d Cir. 1992); and citing *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999)). "Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales*, 240 F.3d at 841 (citation omitted).

Plaintiff cites the proposition that "'[e]vidence of loss of control over business reputation and damage to goodwill' is sufficient to establish irreparable harm." (MTN 17 (quoting *Brian Lichtenberg, LLC v. Alex & Chloe, Inc.*, No. CV 13-6837 DDP (PJWx), 2014 WL 3698317, at *8 (C.D. Cal. July 25, 2014); and citing, e.g., *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001)).) Plaintiff argues that Defendant has already harmed its business reputation and goodwill by preempting "Starcoin's new digital collectibles it was about to license and release." (*Id.* at 18.) Plaintiff's CEO states that Plaintiff can no longer be "first to market" with licensed collectibles and that the market will likely perceive Starcoin not as an innovator but as second to Defendant. (*Id.* (quoting Feinblatt Decl. ¶ 12).) Plaintiff also points to the fact that some investors have chosen to fund Defendant rather than Plaintiff. (*Id.*)

Defendant responds by citing the proposition that "[s]peculative injury does not constitute irreparable injury." (Opp'n 24 (quoting *Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984)).) Defendant advances three reasons why Plaintiff's harm is speculative. First, Plaintiff's harm is not "threatened and imminent" because it has no product, no customers, no celebrity partnerships, and no established reputation. (*Id.* at 25 (citing *Lilith Games (Shanghai) Co. v. UCool, Inc.*, No. 15-CV-01267, 2015 WL 5591612, at *10 (N.D. Cal. Sept. 23, 2015)).) According to Defendant, Plaintiff has not presented any evidence demonstrating it was about to or could launch a product.

Second, Defendant points to authority stating where parties "'operate in different segments of the market,' claims of irreparable harm from customer loss are 'speculative at

best.'" (*Id.* (quoting *Finjan, Inc. v. Blue Coat Sys., LLC*, No. 15-CV-03295, 2016 WL 6873541, at *6 (N.D. Cal. Nov. 22, 2016)).) Defendant contends that Plaintiff operates in a different market as Defendant. Defendant's CryptoKitties is a web-based, gaming application whereas Plaintiff's slide deck suggests its final product would be an investment mechanism for celebrities. (*Id.* at 26.)

Third, Defendant states that "a plaintiff must 'proffer specific facts or evidence' supporting irreparable harm to secure injunctive relief." (*Id.* (quoting *Brighton Collectibles, Inc. v. Pedre Watch Co., Inc.*, No. 11-cv-0637, 2013 WL 5719071, at *4 (S.D. Cal. Oct. 21, 2013)).) Defendant contends that Plaintiff has not put forward any specific numbers demonstrating loss and instead relies on naked assertions about losing its ability to be "first to market." (*Id.*) Defendant concludes by asserting that the chronology of events demonstrates that Plaintiff could not have been first to market, regardless of its trade secret disclosure to Defendant. (*Id.* at 26–27.)

Plaintiff counters by pointing out that the cases cited by Defendant for parties operating in different market segments rely on trademark or copyright law. (Reply 7.) In those cases, Plaintiff contends the harm was derived from a released product and repeated infringement. (*Id.*) According to Plaintiff, the harm in a trade secrets case, like here, occurs when the trade secret is first misappropriated or disclosed because the trade secret loses all its value when it is not a secret. (*Id.*)

The Court begins by noting that Plaintiff has not quantified its injury in any respect. Instead, Plaintiff's CEO states "[w]e have already suffered tremendous loss, and this loss will be an irreparable, total loss if Axiom is not enjoined." (MTN 18.) Generally, intangible injuries, such as lost customers and harm to goodwill, can be enjoined. *See Rent-A-Center, Inc. v. Canyon Tele. & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). The Court accepts the general proposition that if Plaintiff lost customers or goodwill to Defendant then the Court might find irreparable harm. Yet, there is a critical element missing—without any sort of product or service in the marketplace there are no customers or goodwill to lose. Plaintiff has not put forward any evidence that it has lost prospective

customers or goodwill or that it imminently will lose either. *See Stuhlbarg Int'l Sales*, 240 F.3d at 841. As Defendant points out, "speculative injury does not constitute irreparable injury." *Goldie's Bookstore*, 739 F.2d at 472. Because Plaintiff has not demonstrated that it has a product or that its product will reach market soon then claimed loss in prospective customers or goodwill is too speculative to credit.

Plaintiff's argument that it has lost investors provides more concrete evidence of harm. Yet, Defendant argues Plaintiff has provided no support for its contention that investors left Plaintiff for Defendant explicitly because of Defendant's purported misappropriation. (Opp'n 27.) The Court agrees with Defendant. While lost investors represents potential harm, Plaintiff has not offered any proof demonstrating that the loss of investors stems in any respect from the use of its purported trade secret. As Defendant illustrates, those same investors were already in discussion with Defendant before the February 9, 2018 disclosure by Mr. Feinblatt, which militates against inferring that those venture capitalists invested in Defendant because of the trade secret. Moreover, Plaintiff has not established why monetary damages would not remedy any loss in investor capital, which also weighs against the extraordinary remedy of an injunction.

On the other hand, the Court disagrees with Defendant that there is no irreparable injury where the two companies "operate in different segments of the market." *Finjan, Inc. v. Blue Coat Sys., LLC*, No. 15-CV-3295, 2016 WL 6873541, at *6 (N.D. Cal. Nov. 22, 2016). As Plaintiff points out, the cases Defendant cites for this proposition are a patent case, *see id.* at *5–6, a copyright case, *LucasArts Ent'mt Co. v. Humongous Entm't Co.*, 815 F. Supp. 332, 337 (N.D. Cal. 1993), and a trademark case, *Lindeboom v. Plaster City Digital Post, LLC*, No. CV88077 SVW (JTLx), 2009 WL 10670660, at *4 (C.D. Cal. Apr. 29, 2009). The Court does not read those cases as controlling in a trade secret case and Defendant does not cite any authority to extend the reasoning of those cases to a trade secret case. If two companies operate in different segments of the market and one discloses the trade secrets of the other then harm could, in theory, still exist. However, given the Court's conclusions—both in this section and in the order—whether Plaintiff and

Defendant operate in different segments of the market is not dispositive. And, Plaintiff has not demonstrated that it competes in any segment of the market and the Court cannot undertake a comparison between products in the first instance.

The Court accepts the general proposition that Plaintiff could have been harmed by disclosure of its trade secret. But, that general proposition requires facts to support it, which have not been provided. Therefore, the Court finds that Plaintiff has not proffered sufficient evidence demonstrating its irreparable injury. The Court does not foreclose the possibility that Plaintiff could do so, but where a company does not offer evidence of a product or service then claims of lost customers and goodwill ring hollow.

## III. Balance of Equities

"In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)).

Plaintiff contends that it will suffer severe financial harm if the injunction is denied. (MTN 19–20.) It claims that Defendant has only recently launched its new Stephen Curry CryptoKitty and enjoining Defendant will therefore not outweigh Plaintiff's harm. (*Id.* at 20.) According to Plaintiff, its harm includes the loss of its leadership position in the market and potential evisceration of its most valuable asset, its trade secrets. (*Id.*)

Defendant responds that celebrity partnership and licensing is a key component of its business and the requested injunction would end Defendant's prospective partnerships with numerous entertainers. (Opp'n 29 (citing Tedman Decl. ¶ 5).) Defendant contends that if the Court were to grant an injunction it would lose both time and resources dedicated to securing celebrity partnerships as well as potentially damaging its relationship with current and future investors. (*Id.*) Defendant points out that Plaintiff has not yet entered the market and the absence of an injunction does not impede Plaintiff from pursuing the business model Plaintiff put forward in its slide deck. (*Id.*)

Plaintiff rejoins by contending that a preliminary injunction would not seriously harm Defendant's business model or partnerships. (Reply 7.) Plaintiff points to sales data

18-CV-972 JLS (MDD)

from CryptoKitties to support its thesis that most of Defendant's sales are "common" CryptoKitties, collectible "Fancy Cats," and "Mewtations." (*Id.*) Plaintiff distinguishes those products from Defendant's "Exclusive" CryptoKitties, such as the "CurryKitty." Plaintiff contends that "the value of these Cryptokitties lies in their exclusivity, not in any potential partnership or license agreement with a celebrity, athlete, or entertainer." (*Id.* at 8.) Under this theory, Plaintiff argues its proposed injunction does not prevent Axiom from marketing CryptoKitties. (*Id.*)

Here, it is difficult to quantify the harm to Plaintiff. The source of the difficulty derives from the broad trade secret Plaintiff claims. Is the trade secret a token offering exchange for entertainers as the slide deck purports to show? Is the trade secret licensing digital collectibles as Plaintiff's moving papers claim? If the answer is the former then enjoining Defendant will not impact Plaintiff because the two companies would not operate in the same market. An injunction would harm Defendant greatly because it is currently pursuing celebrity licensing. If Plaintiff's trade secret is, in fact, licensing digital collectibles then it has a better argument that it will be harmed if Defendant is not enjoined.

Plaintiff runs into a separate problem when considering the scope of a potential injunction. At oral argument, Plaintiff clarified the scope of the proposed injunction and requested the Court enjoin Defendant from licensing with celebrities, athletes, entertainers, and musicians. (Transcript 25.) This request is overly broad considering that the basis for Plaintiff's suit derives in large part from the fact that it fortuitously used a stock image of Mr. Curry in its mock up. At most, Plaintiff's mockup supports an injunction against a CryptoCurry, assuming the other elements of a preliminary injunction were met. A second problem arises when considering the proper party for the injunction. The harm to Plaintiff derives from the release of the CryptoCurry and, perhaps, future digital collectibles with celebrity likenesses. The only defendant before the Court is Axiom, but Axiom is not the entity that released CryptoCurry. The Court cannot enjoin Axiom from releasing CryptoCurry, nor can it enjoin any other digital collectible because Dapper Labs has the rights to CryptoKitties.

The dispositive fact here is that Plaintiff has not demonstrated it has a product or will have a product ready for release in the near future. On the other hand, Plaintiff's CryptoKitty is currently competing in the marketplace and a restraint on their business would be a greater harm than to Plaintiff.[10] Moreover, Plaintiff has not demonstrated how enjoining Axiom would protect its trade secret when Dapper Labs has the rights in CryptoKitties.

Accordingly, the Court finds the balance of equities tips in Defendant's favor.

## IV. Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

Plaintiff characterizes the public interest as a strong interest in protecting trade secrets. (MTN 20–21 (citing, e.g., *Hunter Consulting*, 2012 WL 6193381, at *5).) Plaintiff would apply the general rule protecting trade secrets to this case. (*Id.* at 21.) Defendant responds that Plaintiff cannot cite any public interest other than a broad appeal to defend trade secret misappropriation. (Opp'n 29.) Instead, Defendant cites cases standing for the proposition that where a party has not shown likelihood of success on the merits, irreparable harm, or a balance of the equities then an injunction is not in the public interest. (*Id.* at 29–30 (citing, e.g., *OG Int'l, Ltd. v. Ubisoft Entm't*, No C 11-4980 CRB, 2011 WL 5079552, at *11 (N.D. Cal. Oct. 26, 2011)).)

Here, the Court agrees, in theory, with Plaintiff's proposition that trade secrets should be protected. However, because Plaintiff has not demonstrated that it has a likelihood of success for a trade secret misappropriation claim, the Court finds an injunction in this instance is not in the public interest.

---

[10] Plaintiff theorizes that Defendant's potential licensing deals for celebrities are not the driving factor behind CryptoKitty sales. (*See* Reply 7.) Plaintiff cites sales data from Defendant's initial sales of CryptoKitties. The Court does not find this persuasive because the sales data demonstrates that Defendant had a product that people wanted to buy. If Defendant were able to associate with celebrities then it is logical that celebrity likenesses might further drive sales.

# CONCLUSION

The Court finds the dispositive factor to be that Plaintiff has not carried its burden to demonstrate a likelihood of success on the merits. Further, the Court finds that Plaintiff's irreparable harm is speculative and difficult to quantify given its early stage and the fact it has not released a product. Finally, the Court finds that the balance of the equities does not clearly tip in Plaintiff's favor and the public interest does not favor an injunction. Accordingly, the Court **DENIES** Plaintiff's Motion for a Preliminary Injunction, (ECF No. 5).

**IT IS SO ORDERED.**

Dated: July 9, 2018

Hon. Janis L. Sammartino
United States District Judge